# EXHIBIT 3



# Demand for Arbitration Before JAMS

**TO RESPONDENT:** Tesla Motors, Inc.
(Name of the Party on whom Demand for Arbitration is made)

Address: 45500 Fremont Blvd

City: Fremont     State/Province: CA     Zip: 94538

Telephone:     Fax:     Email:

Representative/Attorney (if known): M. Yusuf M. Mohamed, Associate General Counsel
(Name of the Representative/Attorney of the Party on whom Demand for Arbitration is made)

Address: 45500 Fremont Blvd

City: Fremont     State/Province: CA     Zip: 94538

Telephone: 510.249.2868     Fax:     Email: ymohamed@teslamotors.com

Add more respondents on page 5.

**FROM CLAIMANT (name):** Cristina Balan

Address: 4698 Arbors Cir.

City: Mukilteo     State/Province: WA     Zip: 98275

Telephone:     Fax:     Email:

Representative/Attorney of Claimant (if known): Noah D. Lebowitz
(Name of the Representative/Attorney of the Party Demanding Arbitration)

Address: 100 Bush St, Ste 1800

City: San Francisco     State/Province: CA     Zip: 94104

Telephone: 415.433.0333     Fax: 415.449.6556     Email: noah@dplolaw.com

Add more claimants on page 6.

**Nature of Dispute:** Claimant hereby demands that you submit the following dispute to final and binding arbitration (a more detailed statement of the claim(s) may be attached).

Dispute: See Attached Exhibit A





# Demand for Arbitration Before JAMS

**Arbitration Agreement:** This demand is made pursuant to the arbitration agreement which the parties made as follows (cite location of arbitration provision and attach two (2) copies of entire agreement).

Arbitration Provision Location: Arbitration provision was attached and incorporated into Claimant's 2010 and 2013 offer letters. Both letters are Attached as Exhibit B.

**Claim & Relief Sought By Claimant:** Claimant asserts the following claim and seeks the following relief (including amount in controversy, if applicable).

Claim: See Attached Exhibit A.

By agreement of the parties, the statute of limitations was tolled from January 1, 2015 through April 1, 2015. A copy of the relevant tolling agreement is attached as Exhibit C.

**Response:** Respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. Send the original response and counter-claim to the claimant at the address stated above with two (2) copies to JAMS.

## Request for Hearing:

JAMS is requested to set this matter for hearing at: San Francisco
(Preferred Hearing Location)

## Election For Expedited Procedures (Comprehensive Rule 16.1)

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

Signed (Claimant): *[signature]*
(may be signed by an attorney)

Date: April 1, 2015

Type / Print Name: Noah D. Lebowitz

Please include a check payable to JAMS for the required initial, non-refundable $400 per party deposit to be applied toward your Case Management Fee and submit to your local JAMS Resolution Center.



# Demand for Arbitration Before JAMS

### COMPLETION OF THIS SECTION IS REQUIRED FOR CLAIMS INITIATED IN CALIFORNIA

**A. Please indicate if this**  ☒ IS   or   ☐ IS NOT   **a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e):**

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

    1) The contract is with a consumer party, as defined in these standards;

    2) The contract was drafted by or on behalf of the non-consumer party; and

    3) The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

    1) An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;

    2) An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;

    3) An individual with a medical malpractice claim that is subject to the arbitration agreement; or

    4) An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.

**B. If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Effective January 1, 2003, private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

Annual Salary:   ☐ Less than $100,000    ☐ More than $250,000
                ☒ $100,000 to $250,000    ☐ Decline to State

**C. In California, consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information.

## ATTACHMENT A TO JAMS DEMAND FOR ARBITRATION

<u>Summary of Facts Supporting Claims Arising from January 18, 2013 Termination</u>

Claimant Cristina Balan ("Claimant" or "Balan") was hired by Respondent Tesla Motors, Inc. ("Respondent" or "Tesla") on August 16, 2010 as a Senior CAD Engineer in the Battery Engineering Department. Her initial salary was $106,438 per year. She also received 4,250 stock options, with an exercise price of $20.72. Those options vested as follows: 25% after the first 12 months of employment, the remaining 75% in equal monthly installments over the following 36 months.[1] Balan's offer letter was signed by Tesla's Chairman of the Board and CEO, Elon Musk.

Balan worked tirelessly for Tesla. Many weeks she worked 90-plus hours. She worked to the point of physical and mental exhaustion. In the first half of 2011, Balan was taken to the hospital by ambulance from Tesla because of chest pain. The doctors told her that she was experiencing cardiac issues related to her work. Because she was dedicated and loved her work so much, Balan continued to work the same amount of hours for Tesla.

By mid-February 2012, Balan finally decided that she needed to separate from Tesla and sent an email to her supervisor, Joss Geidischek telling him that the last week of March would be her final week with Tesla. Geidischek responded almost immediately, asking for an opportunity to convince Balan to change her mind. In the end, Geidischek was successful in that endeavor. Tesla enticed Balan to maintain her employment by providing the following additional terms of her employment: Balan was permitted to split her time every month between Vancouver (where her parents live) and Fremont; Tesla paid travel costs associated with the split time arrangement; and Tesla paid Balan's rent in Palo Alto. With these additional terms in place, Balan agreed to continue her employment, working the same amount of hours as before.

Throughout this entire time, Balan was part of a team of seven CAD engineers. All seven engineers were classified by Tesla as "exempt" from overtime laws. In light of her prior work experiences as a CAD engineer, Balan and other coworkers believed this was in error. Especially considering the extraordinary amount of extra hours she put into the company, Balan felt she was not being fully compensated for her efforts. When Balan and others raised the issue of whether the engineers had been misclassified, she was rejected, though four of the seven engineers were reclassified as entitled to overtime pay.

---

[1] In 2012 Balan received an additional grant of 2,000 with an exercise price of $31.49, with a similar vesting schedule beginning with the date of the grant. As a result of her termination, Balan exercised all vested options (approximately half of her collective grants) and immediately sold all those shares because of her loss of income. At the time, the stock was trading in the $35-$45 range.

1

Balan learned of the reclassification decision in late November 2012. Balan learned that Tesla continued to take the position that she was exempt from overtime. To her, this was the final straw. Even with the additional terms of employment put in place in the early part of the year, Balan could not countenance Tesla's continued rejection of her eligibility for overtime pay; in other words, her working conditions had become intolerable. So, she again gave notice of her intent to resign. She initially gave two weeks' notice, but her supervisors begged her to extend the transition so she could help finish some projects. She agreed, and the date for resignation was set for January 18, 2013.

Over the next several weeks, her managers and supervisors asked her continuously to reconsider her decision. In early January, Balan received some frightening news from her medical providers. She had lumps in her breasts that appeared consistent with cancer, though more tests were required to confirm the diagnosis. Given this revelation, and the uncertainty of unemployment ahead, Balan informed Tesla management and Human Resources that she was retracting her resignation. Her decision was accepted with enthusiasm and relief.

When asked about the reasons for her decision, Balan initially said she had a change of heart. A couple of days later, Balan revealed to various individuals in Tesla the circumstances of her recent medical issues. Within a day or two of that revelation, Balan was called to a meeting with Geiduschek and Director of Human Resources Helen Barker. At that meeting, during which Geiduschek and Barker acknowledged they were aware of Balan's recent medical condition, they informed Balan that Tesla had changed its decision and decided to "accept" her resignation and enforce her originally planned resignation date of January 18. Ms. Balan objected, asking the reason for their about-face on her retraction of her resignation and their enthusiasm at her return just days earlier. The only explanation was "we changed our mind." Barker then told Balan that if she kept quiet, did not raise a problem and resigned, the company would consider a transfer to Interiors.

The next week, Balan spoke with the Director of Interiors who was excited about bringing her talents to his division. After he spoke with Human Resources, however, he told Balan he was not permitted to bring her back for at least the next three to four months.

Legal Claims[2]

Balan brings the following claims arising from her August 2010-January 2013 employment:

(1) Wrongful Termination in Violation of Public Policy[3];
(2) Failure to Pay Overtime Compensation (Labor Code §§ 510, 1194, 1198; 8 CCR § 11040);
(3) Failure to Provide Meal and Rest Breaks (Labor Code §§ 226.7, 512; 8 CCR § 11040)
(4) Failure to Keep, Maintain, and Furnish Accurate Wage Statements and Time Records (Labor Code §§ 226, 1174; 8 CCR § 11040); and
(5) Unfair Competition (Bus. & Prof. Code § 17200 *et seq.*)

Remedies Sought

Balan seeks the following remedies:

(1) General damages according to proof;
(2) Special damages according to proof;
(3) Punitive damages on the claim for Wrongful Termination in Violation of Public Policy;
(4) Reasonable attorneys' fees and costs pursuant to Labor Code §§ 218.5 and 1194;
(5) Interest at the maximum legal rate on all sums awarded;
(6) Restitution pursuant to Bus. & Prof. Code § 17203;
(7) Such other relief as the Arbitrator deems just and proper

---

[2] Prior to litigation, the parties entered into a tolling agreement, suspending the statute of limitations from January 1, 2015 through April 1, 2015.

[3] Balan's WTVPP claim is tethered to the California Fair Employment and Housing Act's prohibition against disability discrimination and medical condition discrimination (Gov. Code §§ 12900 *et seq.*) as well as the misclassification of her employment as exempt from overtime in violation of the California Labor Code and Code of Regulations.

3

Summary of Facts Supporting Claims Arising from April 18, 2014 Termination

Despite the feelings of betrayal by certain members of human resources and Tesla management, Balan continued to believe in Tesla and Musk's articulated vision for the company. She remained in touch with several people within Tesla and kept them informed of her medical condition – including the fact that further tests confirmed that her cancer essentially was in remission. The folks in Tesla's Interiors division similarly continued to believe in Balan, despite pushback from human resources. Finally, in the Summer of 2013, Interiors was given approval to re-hire Balan. During the hiring process, Marissa Peretz from human resources bluntly told Balan that she could return on the "condition" that she "forget everything that happened in January."

Balan was hired in June 2013, with a starting date of July 8, 2013, as a Senior CAD Engineer in the Interior Systems Department. Her salary was $112,000 per year. She also received 3,500 stock options with an exercise price of $147.38, with the same vesting schedule as before. As with her first employment, this offer letter was signed by Chairman of the Board and CEO Elon Musk.

Shortly after her return to Tesla in July 2013, Balan contacted the IT department and asked to have her email account populated with her former email records and archives. The initial response from IT was that it would be no problem, "a click" is all it would take to accomplish. After some weeks, however, the emails had not been restored. At first, it was explained to have been a "glitch" that the files were not available. Then, most of the emails were restored – *all except for the period January 3-17, 2013*.[4]

Balan hit the ground running, working on innovations that would help improve production and save Tesla money. As with her first employment with Tesla, Balan was classified as exempt from overtime and was not afforded overtime, meal and rest breaks, and no accurate records of her time were maintained by Tesla. As with her initial employment with Tesla, Balan continued to work overtime, though not in the extreme amounts as before.

In September 2013, Balan first learned of the ire her work evoked from her chain of command. In particular, her lead Andrew Raczkowski and her manager Derek Allen, told her that her innovations and actions made Raczkowski look bad in the eyes of senior management. They told her to stick to her chain of command. Balan was shocked by this comment, but tried to let it slide.

Musk once wrote in a memo to Tesla employees: "Any manager who allows this [restricting employees to the chain of command] to happen, let alone encourages it, will soon

---

[4] These weeks, of course, are crucial because this is the time period during which Balan communicated her intent to retract her resignation and human resources' enthusiastic acceptance of her decision; all of which took place prior to her disclosure of her medical condition. Suddenly, these emails were all missing. IT finally revealed that someone had deleted the file, though they did not reveal who had done so.

find themselves working at another company. No kidding." As described below, when Balan tried to follow this sentiment, she suffered dearly at the hands of her chain of command.

Things worsened over the next several months. Balan discovered that Raczkowski and Allen were engaging in what she believed to be fraudulent behavior in funneling a vendor contract to an acquaintance even though that vendor was objectively the least likely of the vendor candidates to adequately perform to the contract. She similarly discovered their knowing approval of the sale of cars with defective roofs. Balan challenged and raised objections to these decisions both directly to Raczkowski and Allen, as well as to others. Shortly thereafter, Raczkowski and Allen brought down a series of harassing and retaliatory actions against her. Balan told them that she felt she was being treated differently because she is a woman and that she would file a discrimination claim against them. Soon after saying this, Balan had all her responsibilities taken from her and was demoted to a position where she was permitted only to perform the tasks of a draftsman.

When Balan attempted to remedy her situation through internal channels, she was railroaded and threatened. She was dissuaded repeatedly from bringing her concerns directly to Musk, even though she believed he needed to know what was happening. When an investigation was finally opened by Tesla Associate General Counsel Steven Cooper, Balan was treated with hostility and her claims disregarded. That investigation, such as it was, failed the standard of practice for internal investigations by several degrees. For instance, Cooper refused to interview witnesses identified by Balan, failed to actually investigate anything, and failed to provide any results from his investigation.

By mid-April 2014, things had worsened to such a degree that Balan's health was again deteriorating under the strain and stress of it all. On April 14, she sent an email telling the Director of Engineering Eric Bach that she intended to resign. Bach immediately called Balan and asked to speak with her directly. In their meeting the next day, Bach pledged to transfer Balan away from her current group so long as she refrained from speaking with Musk the following day, as she had planned. Balan agreed and Bach confirmed the agreement.

Later that night, Balan received an email from Peretz in human resources asking for a meeting the next day. At 1:00 the next day, Peretz and Bach escorted Balan to a small room in a construction area. Several security guards were awaiting the group and stayed outside the room after the group entered. Peretz proceeded to say that Tesla had accepted Balan's resignation. Balan objected, saying there was a misunderstanding, looking to Bach for support. Peretz said that if Balan did not sign the resignation paperwork she will have the security guards remove Balan from the building. Balan signed the paper (attached) after writing the reason(s) for her decision.

On her way out of the building, Balan collapsed from the emotional toll of the entire sequence of events. She woke up in the ambulance on the way to the hospital where she was told if someone had not caught her when she fainted, she easily could have had serious head injuries from the event.

5

On January 15, 2015, Balan filed her administrative complaint with the California Department of Fair Employment and Housing (DFEH). On that same date, the DFEH issued Balan her Notice of Right to Sue.

Legal Claims

Balan brings the following claims arising from her July 2013-April 2014 employment:

(1) Sex Discrimination in Violation of the Fair Employment and Housing Act ("FEHA") (Gov. Code §§ 12900 *et seq.*)
(2) Retaliation in Violation of the FEHA;
(3) Failure to Prevent Discrimination or Retaliation in Violation of the FEHA;
(4) Violation of Labor Code § 1102.5;
(5) Wrongful Termination in Violation of Public Policy[5];
(6) Failure to Pay Overtime Compensation (Labor Code §§ 510, 1194, 1198; 8 CCR § 11040);
(7) Failure to Provide Meal and Rest Breaks (Labor Code §§ 226.7, 512; 8 CCR § 11040)
(8) Failure to Keep, Maintain, and Furnish Accurate Wage Statements and Time Records (Labor Code §§ 226, 1174; 8 CCR § 11040)
(9) Waiting Time Penalties (Labor Code §§ 201-203); and
(10) Unfair Competition (Bus. & Prof. Code § 17200 *et seq.*)

Remedies Sought

Balan seeks the following remedies:

(1) General damages according to proof;
(2) Special damages according to proof;
(3) Punitive damages on the claim for Discrimination, Retaliation, Failure to Prevent Discrimination & Retaliation, Wrongful Termination in Violation of Public Policy, and Labor Code § 1102.5;
(4) Reasonable attorneys' fees and costs pursuant to Labor Code §§ 218.5, 1102.5, and 1194;
(5) Interest at the maximum legal rate on all sums awarded;
(6) Restitution pursuant to Bus. & Prof. Code § 17203;
(7) Penalties pursuant to Labor Code §§ 203, 205.5, 226 *et seq.*, 558, and 1102.5;
(8) Such other relief as the Arbitrator deems just and proper

---

[5] Balan's WTVPP claim is tethered both to the California Fair Employment and Housing Act's prohibition against sex discrimination and retaliation as well as Labor Code § 1102.5.

6