# EXHIBIT 8

## Huang, Diana

| | |
|---|---|
| **From:** | Tina Oja <toja@jamsadr.com> |
| **Sent:** | Thursday, October 18, 2018 2:29 PM |
| **To:** | Hernaez, Alexander; yperetz@peretzlaw.com; Li, Lucy; dgaribaldi@peretzlaw.com |
| **Cc:** | khaswell@peretzlaw.com; Huang, Diana |
| **Subject:** | [EXT] Balan, Cristina vs. Tesla Motors, Inc. - JAMS Ref No. 1100080567 |
| **Attachments:** | Final Award_Corrected_101818.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Counsel,

Please see the message below from the arbitrator and the attached Final Award-Corrected. A hard copy of this corrected version will follow via regular mail.

Thank you,
Tina

Counsel,

I have given the Final Award my traditional "last" review, and discovered several, non-material errors that I have corrected.  These are in addition to the error delivered to you this morning by Ms. Oja.  For your convenience, the full version of the corrected Final Award is attached.  I corrected the following specific errors:

On page 28, paragraph 10 has been corrected to include reference to the proper method of interest calculation in paragraph 22 of the Award;

On page 34, 3rd line of the last paragraph, the word "be" has been inserted;

On page 47, in bullet point 7, the word "Interim" has been changed to "Final";

On page 50, a spacing issue following the quote at the top of the page has been corrected; and

On page 52, the page reference in footnote 68 has been corrected.

Thank you for your understanding.
James L. Warren (Ret.), Arbitrator


**Tina Oja**
Case Manager



**Local Solutions. Global Reach.™**
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111
 P: 415-774-2627   |   F: 415-982-5287
 www.jamsadr.com

Judge James L. Warren (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA  94111
Telephone (415) 982-5267
Facsimile (415) 982-5287
Arbitrator

JAMS ARBITRATION

| | |
|---|---|
| Cristina Balan,<br><br>         Claimant,<br><br>vs.<br><br>Tesla Motors, Inc.,<br><br>         Respondent. | JAMS Reference No. 1100080567<br>**FINAL AWARD-CORRECTED** |

1.   **Introductory Statement.**  Claimant Cristina Balan brought this arbitration against her former employer, Tesla Motors, Inc., following two separate periods of employment with the company, the first from August 2, 2010 through January 18, 2013, and the second from June 18, 2013 through April 16, 2014.  In the case of each, Balan asserts that she was wrongfully misclassified as an exempt employee who was not entitled to overtime, meal and rest breaks, etc. in violation, *inter alia*, of California Labor Code § 515(a) *et. seq*.  In addition, for the first period of employment, Balan argues that she was wrongfully terminated in violation of public policy because she asked to be re-classified as non-exempt, and because she suffered from possible cancer.  For the second period, she claims that she was demoted following her report of fraud being conducted by her direct supervisors, which demotion escalated into a wrongful termination for the same reason, entitling her to sue for violation of Cal. Lab. Code § 1102.5.  She also asserts claims under the Fair Employment and Housing Act ("FEHA") for discrimination and retaliation,[1] plus additional wage and hour claims and wrongful termination in violation of public

---

[1]     Although Balan's Demand for Arbitration asserts violations of FEHA in connection with her second period of employment (discrimination, retaliation and failure to prevent discrimination and retaliation), she did not discuss them in her closing briefs and appears to have abandoned those claims.  In addition, in her recently filed brief seeking attorneys' fees, Balan slips some $20,426.57 in "waiting time penalties" into her claim for damages (*see,*

1

policy.  She further asserts claims because of cardiac and psychiatric issues proximately caused by Tesla's conduct.  She seeks cumulative damages cresting $6 million.

Balan's Demand for Arbitration was originally filed on April 1, 2015.  The matter proceeded through discovery in the normal course, heading for a Hearing scheduled for mid-2017.  Shortly before that Hearing, however, Balan advised the Arbitrator that her previously described "run-of-the-mill" emotional distress damages had escalated to include damages for Post-Traumatic Stress Disorder ("PTSD"), as well Takotsubo Cardiomyopathy, or "Broken Heart Syndrome."  In order to allow discovery on this expanded scope of claims, the Hearing was rescheduled.  The new Hearing took place from December 18, 2017 through December 22, 2017, with an additional two days of testimony taken on January 4 and 5, 2018.  At the Hearing, Balan was represented by Yosef Peretz and David Garibaldi from the law firm of Peretz & Associates, and by Daniel J. Cravens from the law firm of Cravens & Associates.  Tesla was represented by Alexander Hernaez and Lucy Li from the law firm of Fox Rothschild LLP.  At the conclusion of the Hearing, the parties filed simultaneous post-hearing briefs and reply briefs.

Following the Arbitrator's consideration of those briefs, as well as his extensive review of the evidence adduced at the Hearing, the Arbitrator issued his Interim Award on May 21, 2018.  In that Award, which, with appropriate modifications, is stated in whole below, the Arbitrator found in Claimant's favor on her claims that she was improperly classified as an exempt worker during her employment at Tesla, but found against Claimant on every other claim asserted in the arbitration, including her late-added PTSD and Broken Heart Syndrome claims.[2] He declared Claimant to be the prevailing party with respect to her wage and hour claims, but Tesla to be the prevailing party on everything else.  The Arbitrator then invited the parties to address the question of whether attorneys' fees and costs were awardable at all under this state of

---

Balan's letter brief in support of motion for fees, p. 7, fn. 2).  This is a new claim that Balan did not raise during the hearing, did not argue in her post-hearing brief, and that the Arbitrator did not address in his Interim Award.  It has been waived (*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3rd 912 (9th Cir., 2001; *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3rd 587 (11th Cir. 1995); *Heffelfinger v. Elec. Data Sys. Corp.*, 580 F. Supp. 2nd 933 (C.D.Cal. 2008).

[2]     The evidence adduced at the Hearing established that Claimant suffered from neither.

affairs. Counsel for the parties briefed the issue and the Arbitrator held a further teleconference to address their arguments. At the end of that teleconference, the Arbitrator ruled that Claimant was entitled to file an application seeking recovery of her attorneys' fees and costs with respect to her wage and hour misclassification claim only, but not for any of her other claims, all of which she failed to prove. Because both parties had filed Offers of Compromise pursuant to CCP § 998, the Arbitrator ordered the parties to address the effect of those filings on both parties' ability to collect fees and costs.

The parties thereafter filed comprehensive briefs and supporting documentation on the attorneys' fee/cost issue. After reviewing those papers, the Arbitrator held a final teleconference with counsel on September 14, 2018. At the conclusion of that conference, the matter was submitted for preparation of this Final Award.[3]

The majority of that which follows is the Arbitrator's Interim Award, modified where appropriate. At the conclusion of this Final Award, the Arbitrator addresses the attorneys' fees and costs issues. This Final Award supersedes in its entirety the Interim Award served on May 21, 2018.

 2. **Jurisdiction and Arbitrability.** Arbitral Jurisdiction is conferred by the Arbitration Agreements, annexed to and incorporated into the two offer letters of employment extended by Respondent to Claimant, the first of which was signed by Tesla on August 2, 2010 and by Balan on August 9, 2010, and the second of which was signed by Tesla on June 18, 2013 and by Balan on June 21, 2013. The claims are stated in Attachment A to Claimant's Demand for Arbitration Before JAMS, dated April 1, 2015. On May 8, 2015, Respondent filed its Response to Claimant's Demand for Arbitration. This Response asserts thirty separate affirmative defenses. The claims asserted in the Demand for Arbitration and the affirmative defenses set forth in Tesla's Response are arbitrable (*see,* Case Management Order ("CMO") No. 1).

 3. **Brief Statement of Balan's Claims for Damages.** Cristina Balan was first offered employment at Tesla on August 10, 2010 (Exh. 1). Her job title was "Senior CAD

---

[3] The parties have since stipulated that this Final Award could be filed no later than Monday, October 22, 2018.

FINAL AWARD-CORRECTED

Engineer,"[4] and she was assigned to work on Tesla's "battery team." Under Tesla's guidelines, Balan's talents and the work she was assigned meant that she was exempt from overtime and other salary perquisites provided by California law (meal breaks, certain vacation benefits, etc.). Balan objected to being classified as exempt and sought either to have her position reclassified as non-exempt (which meant that she would get extra pay for working overtime, missing meal and rest breaks, etc.), or to be promoted to an exempt position as a "real engineer." Tesla never reclassified her or gave her a promotional raise.

Balan's first period of employment ended on January 18, 2013. Tesla claims that she voluntarily resigned, while Balan asserts that she was wrongfully terminated in violation of public policy because she had recently been diagnosed with possible breast cancer, and because she had sought reclassification as a non-exempt worker.

Balan was rehired by Tesla on June 18, 2013, a few months after she first departed (Exh. 66). This time her job title was "Sr. CAD Engineer – Interior Systems," and she was placed on Tesla's "interior team." Tesla again classified Balan's job as exempt, so she did not accrue overtime or other Labor Code benefits. On April 16, 2014, Balan again left Tesla. While Tesla argues that Balan voluntarily resigned for a second time as well, Balan alleges that this time she was wrongfully terminated (actively or constructively) in retaliation for blowing the whistle on certain fraudulent practices within Tesla (Cal. Labor Code § 1102.5), as well as for discrimination. Balan seeks damages for lost wages and other employment benefits (stock options), and for emotional distress and physical/psychological injury, claiming that Tesla caused her to suffer from Post-Traumatic Stress Disorder as well from Broken Heart Syndrome. She also seeks punitive damages.

For both sets of employment, Balan seeks damages in the form of lost overtime, meal and rest breaks, etc., all of which she argues she was entitled to receive during her employment

---

[4]     Curiously, the letter of employment annexed to Balan's Demand for Arbitration is dated August 2, 2010, not August 10, 2010, and refers to her job position as "Senior CAD *Designer*," not *Engineer*. It lists her annual salary as $105,000, which is different from the annual salary of $106,438 stated in that version marked as Exhibit 1 during the arbitration. While the Arbitrator has not gone word for word through the two August 2010 letters, they otherwise seem to be the same. Although the Arbitrator has no explanation for the differences, they do not affect the outcome of this arbitration.

because, regardless of the name Tesla ascribed to her work position, it was in fact a non-exempt position for which overtime and other Labor Code requirements applied as a matter of law. To this she adds statutory interest to reach a lost wages claim for both periods of employment of about $678,923.00. In addition, she seeks damages for both instances of alleged wrongful termination, including lost past and future wages and lost stock options (all with an interest component). These categories add a further $2,326,083 to her alleged damages. She concludes by seeking emotional distress and punitive damages. Her total damages claim is just shy of $6,000,000.

Because the facts developed at the arbitral hearing tend to be claim specific, the Arbitrator will set them forth in connection with his analysis of each separate claim for damages. First, however, the Arbitrator makes the following pivotal finding that will apply to every segment of this Award. Rather than individually point out the following conclusions wherever they are relevant, the Arbitrator will refer simply to this "Credibility" section of this Award.

4. **Balan's Credibility Affected Every Claim Asserted in this Arbitration:** Balan is a woman of remarkable technical achievement. As detailed more fully below, her exceptional skills with the CAD tool known as CATIA provided great and material benefits to Tesla, not only when she was using those tools on site, but through methods of using CATIA that she discovered while at Tesla and that Tesla continues to use today. Whatever criticisms one might level at Balan, inability to use the CATIA tool to maximum benefit will not be one of them.

Balanced against her distinguished technical skill on the job, however, is Balan's almost unquenchable penchant for exaggeration, hyperbole, personal magnification,[5] embellishment and, in some instances, outright falsification of facts about events that transpired during the periods relevant to this arbitration.[6] The Arbitrator has most carefully reviewed the evidence,

---

[5]    For example, Balan describes herself as "the engineer who came up with how to save the Tesla Model S" (Tesla Closing Brief, p. 2).

[6]    At the conclusion of the Hearing, Balan testified that, out of all the material witnesses who had testified, every single one of them (Raczkowski, Allen, Edwards, Bach, Gawronski, Gruss, Nussey, Peretz, Porritt, Cooper, Geiduschek, Barker) had lied (Tx., 1963:24 – 1965:3; *see, also*, Tx., 1831:23 – 1832:2). The only person who had testified truthfully was Balan: "Okay, but you're telling the truth? Yes" (Tx., 1965:4-5). Balan's testimony, particularly on Friday, January 5, 2018, the last day of the Hearing, contains the word "lie" or a variation of it

5

written and oral, and in countless instances finds that that evidence either does not support or, at times, flatly disproves Balan's version of the facts.   This conclusion is bolstered, ascertainable only inferentially from the record, by the Arbitrator's ability to watch Balan's facial expressions and physical demeanor as she testified (or as she watched other witnesses testify) during the Hearing.  The rolling eyes, the diffident body postures, the negative or positive shaking of the head, the scowling, the explosive crossing of her arms and similar such conduct are all relevant to the Arbitrator's consideration of the weight he gives to the evidence in this case. Overwhelmingly – and cumulatively – Balan's demeanor supports the Arbitrator's conclusion that the weight to be accorded to much of her testimony must be discounted significantly.  While the Arbitrator found that a good deal of Balan's testimony was credible notwithstanding her amplification of the facts (or, more frequently, her role with respect to those facts), in many other instances the Arbitrator found that Balan's testimony served a more self-aggrandizing than an evidentiary purpose.[7]  The Arbitrator incorporates this finding into the entirety of this Award.

The Arbitrator now moves to his analysis of the several claims that Balan has made against Tesla.  The first is whether she was an exempt or a non-exempt employee under the applicable legal standards.

    5.    **Was Balan an Exempt or Non-Exempt Worker?**

        a.    **The Applicable Legal Standard:**  California Labor Code § 515(a) *et seq.*[8] provides that persons employed in an administrative, executive, or professional position – or as a highly paid computer professional – are exempt from both the minimum wage and the overtime provisions of California law.  For a person to fall under the §515(a) exemptions, that person must be "primarily engaged in the duties that meet the test of exemption" and must "customarily and regularly exercise discretion and independent judgment in performing those

---

dozens of times (Tx., 1712 – 1988, *passim*).  The Arbitrator finds that the correct characterization regarding the truthfulness of witnesses is contrary to that posited by Balan.

[7]    "The most difficult issue has been repeated breakdowns due to a perceived injustice…. [Balan] becomes irrational about the company's perception of her worth" (Exh. 41).

[8]    See, also, 8 Cal. C. Regs. §§11010, *et. seq.*

duties."[9]  Moreover, in a case such as this one where an employee is challenging the exemption, the burden is on the employer to justify it (*Heyen v. Safeway, Inc.,* 216 Cal.App.4th 795, 817 (2013)).  Accordingly, it is Tesla's obligation to convince the Arbitrator that Balan's work during the times she worked there fell within the exemption criteria.

The Arbitrator adverts to certain criteria established by the Regulations that will affect his analysis of the facts.  Those Regulations provide that in order to be exempt from the overtime pay requirements, an employee must be licensed or "primarily engaged" in one of eight numerated professions (law, medicine, dentistry, optometry, architecture, engineering, teaching or accounting).  Alternatively, the employee may be "primarily engaged in an occupation commonly recognized as a learned or artistic profession."[10]  As with many analyses that look at broad descriptions such as "primarily engaged," the devil is in the details.  This is particularly true in labor cases where, even though an employee may have a particular degree (the evidence here established that Balan possessed a degree in engineering), it is the nature of the particular work being done that determines the applicability of the exemption.  As cautioned by the California Division of Labor Standards Enforcement ("DSLE"), "…some employers erroneously believe that anyone employed in the field of … engineering… will qualify for exemption as a professional employee by virtue of such employment.  While there are many exempt employees in these fields, the exemption of an individual *depends upon his or her duties* …" (emphasis added) (DSLE Enforcement Manual, §54.10.6.2).  The Arbitrator thus looks to Balan's specific duties at Tesla.  Because she worked there during two distinct periods of time, the Arbitrator examines each separately to see if her work during either or both was exempt.[11]  The Arbitrator

---

[9]  A third requirement, that the persons "monthly salary [be] equivalent to no less than two times the state minimum wage for full-time employment," is not relevant here.

[10]  8 Cal. C. Regs., §§11010 ("Applicability").

[11]  Tesla argues that Balan was properly classified as exempt because she fell within the Learned Professional Exemption or the Computer Professionals Exemption (*see, e.g.,* 8 Cal.C. Regs. §11010(3)(b); DLSE Enforcement Policies and Interpretations Manual § 54.1; Cal.Lab. Code § 515(a)(1)-(4).  Without going through an extensive analysis of each, the Arbitrator disagrees that Balan fit into either exemption for the reasons stated in this section of the Final Award.

starts by looking at Balan's duties during her first period of employment (August 2, 2010 through April 16, 2014).

        b.      **The Nature of Balan's First Job at Tesla:**  Tesla is an automobile manufacturing company on the cutting edge of battery-operated vehicle technology.  Its CEO, Elon Musk, has a reputation as a visionary entrepreneur, and is involved with numerous diverse projects that are far outside the automotive engineering mainstream (space shuttles, underground vacuum tube tunnels for automobiles, etc.).[12]  During the arbitration, it became abundantly clear that Balan held Musk in high esteem and, as the evidence showed, frequently used him as the "standard" for the proper work ethic within Tesla.

      When Balan first joined Tesla in early August 2010, it was producing the Model S, which was "one of the world's most advanced zero-emission, all-electric vehicles" (Tesla's Post-Hearing Brief, p. 5).  Although the evidence regarding many facets of this case was in conflict, the testimony was uniform in establishing that Balan was an exceptionally talented worker, particularly with Computer Assisted Design ("CAD") and Computer Aided Manufacturing ("CAM") programs.  One such program, called a Computer Aided Three-Dimensional Interactive Application, or "CATIA," was her particular forte.  Many workers at Tesla relied heavily on some or all of these computer tools to design and manufacture the many components that went into a Tesla vehicle (Tx., 1495:10-14; 1514:10-15).  Balan, however, who described herself as the "CATIA fairy" (Tx., 1669:20 – 1670:20) (*see,* "Credibility"), excelled.

      The history of Balan's expertise with the CATIA program is important.  She testified that she was introduced to CATIA during an internship (Tx., 91:17-21), and gained increasing experience through on-the-job-training, including certain certifications in use of the tool, thereafter (Tx., 91:23 – 93:24).  The ability to use CATIA software does not require a degree in engineering and, indeed, four out of seven members of Balan's CAD Support Team (all of whom used CAD, CAM or CATIA software, or a combination) did not have such a degree (Tx., 174:7

---

[12]     There was scant evidence introduced on these points during the arbitration, but they provide helpful background and context information and, while not themselves probative of Balan's claims, are very well known in the community.

– 176:12).  Nevertheless, most of them performed "similar job functions" with their CAD/CATIA support work (Tx., 661:3-13).

Balan's job title when she joined Tesla was "Senior CAD Engineer" (Exh. 1).[13]  She was assigned to Tesla's "battery team," where her immediate supervisors, in order of hierarchy, were Joss Geiduschek and Ernest Villanueva.  Because the battery was the innovative heart of Tesla's Model S, the battery team's work was critical to the success of the car.  Without a functioning battery assembly, there would be no commercially viable Model S.

There were six CAD operators in the battery team when Balan joined it.  The evidence was not entirely clear regarding the specific functions of the other CAD operators, but it was apparent that they all worked on the creation of the "clamshell," as the plastic assembly that held the batteries was known on the floor (see, e.g., testimony of Peter Tennesen, quoted at pp. 10 -11 infra).  Balan soon established herself as a CAD engineer with a superlative ability to use CATIA to maximum benefit in support of designing the battery pack tolerances, etc.  What the evidence does not establish, however, is that Balan "design[ed] the Model S battery pack" itself (see, Tesla Reply Br., pp. 2, 6).

The clamshell was a complicated plastic devise designed to accommodate the battery assembly that powered the Model S.  The Model S required 16 battery modules, each containing multiple interfaces, all of which had to be fitted into the plastic clamshell.   It was the job of the battery team to design the precise specifications for the clamshell so that it could hold the 16 battery modules.  Balan's work required a superior degree of talent, as the specifications and tolerances that went in to creating the clamshell were numerous and delicate.  Her supervisor, Ernest Villanueva, described Balan's work thusly:

> "Q.    Before Ms. Balan started her work, what data would she be given by other people in order to create the physical thing in front of you [referring to a demonstrative exhibit of a portion of the plastic clamshell]?
>
> "A.    It would be the rough cell positions.  Some of these programs, she started as early as just we had a rough idea where the cell should be but not the final position.

---

[13]    The Arbitrator looks again at the differences between the two Balan employment offer letters of April 2010 (see, fn. 1, supra).  For the reasons stated in this Award, however, it does not matter whether Balan's title was engineer or designer; the result will be the same (see, p. 11, infra).

"So she would work out the position of the cells and then a rough idea of where, you know, some of these other parts would be.

"And she would be working with – we would have a rough idea, and she would be working – negotiating with another engineer on to how these parts should interact with each other – actually, all the parts that actually interface with this, including this cooling tube that's inside of here" (Tx., 686:21 – 687:11).

Counsel asked Mr. Villanueva to elaborate on his description:

"Q.     So she would be the person that would have to figure out the tolerance verses the height versus the depth, all the different features?

* * * * *

"A.     I mean, she's weighing all those – there's features in here that look just like a shape that was dropped, but it's really an expressing of weighing all those different criteria, taking input. And, you know, these cells have a tolerance. So you have to decide show wide to make this feature here so that all the cells can fit. And then you're weighing the manufacturing there. And then, you know, the various parts that come in, they have their own tolerance and placement. And so, you know, this part has its own tolerances. And as it's brought down, you want it to be brought down easily and not interfere.

"And so, you know, she's weighing how far back this wall should be from this part and then how tall it should be and then weighing, like, is it robust enough to handle some of the loads that we're expecting. So making it thick enough so that, you know, if, say, a tool is dropped, that this part doesn't break. I mean, a tool in the sense of a screwdriver of something" (Tx., 675:13 – 676:15).

Counsel for Tesla asked Villanueva a series of questions that were intended to demonstrate Balan's use of independent judgement and decision making in her job, important considerations when determining whether an employee is properly categorized as exempt. Villanueva provided the following example of the types of decisions that Balan would have to make:

"Q.     Well, give me an example of a conflict situation that [Balan], using her judgment, would have to resolve.

"A.     I was trying to – so these features are made by two halves of a tool. And sometimes a feature is on one side, and sometimes it's on the other.

* * * * *

"Flipping the side that that feature is made, you know, is one of the more simpler ones.  But then, you know, weighing how this cooling tube exits from the module and the features around it is something that she's designing.

"These features on this side, which interfaces [sic] with this, is understanding the tolerances of the stamped metal part and the placement tolerances of it to ensure that there's never an interference between this part and the part that she's designing.

"And then, in terms of – you asked for exceptions?

"Q.    I asked for resolving [conflict].

\* \* \* \* \*

"A.    What's not shown here is – well, we're trying to optimize as much metal here to carry current, and we need to feed a wire in between here to sense voltage.

"And [Balan's] trying to minimize the amount of space required for this channel which holds the wire, and then taking into account the tolerances of this part and then the part that she's designing and trying to minimize how big this feature is on her part so that we can get as much metal on the adjoining part.

\* \* \* \* \*

"Well, the – the broad strokes and kind of the placement happen in the first few weeks, but working out all these details and making sure everything works together is the thing that takes – it's the hard part.  It's the thing that the most time.

"So there's a lot of detail work that goes into it" (*Ibid.,* 689:17 – 691:18).

Peter Tennesen, a senior mechanical engineer who was employed at Tesla at the same time as Balan, added further details of Balan's work.  Importantly for purposes of the question before the Arbitrator, he described how the senior design engineers at Tesla would come up with the main design for the part "90 percent done," and then pass it off to the battery team (Balan) to provide the details:

"Q.    How did the lead engineers direct CAD designers to use CATIA?

"A.    \* \* \* Like, in my case, [witness describes certain aspects of his own work].

"That was sort of one extreme.  On the other extreme, which the clamshell falls into this example, a design engineer would have the model, call it 90 percent done, to where, you know, if you had the rough model or the prototype sitting next to this one,

you could stand on the other side of the room and say same part.  The gross features are there, the *design intent is evident*, but the details aren't in there yet.

"That was the state at which [Balan] was brought in to the clamshell, just because it was so labor-intensive to model that part.  And to be able to meet the timelines required, multiple people were working on it in parallel" (*Ibid.*, 779:9 – 780:9) (emphasis added).

Tennesen further described the relationship between the "lead engineers" at Tesla and the

CAD/CATIA designers who supported them:

"Q.    Do you know how the lead engineer on the battery module team worked with his CAD designers?

"A.    Yes.  So the *lead engineer would bring in a CAD designer* relatively early because it was not just a matter of getting help with the drawing; it was a matter of modeling the part initially in 3-D.

"Q.    And is that how [Balan] worked for the lead designer on the battery module team?

"A.    That's right.  Yeah, she worked very closely with the lead designer on the battery team and with multiple design engineers on the battery team in that capacity.

"Q.    Do you have any examples of how closely [Balan] would work with them?

"A.    Sure, actually.

"So shortly after Paul Kreiner left the company and Robbie Sumpf was the only person working on the battery clamshell, [Balan] was on the team at the time and we had just expanded into a new office space.  And in order to have the focus and the number of hours they needed to finish the project, [Balan] and Robbie actually moved their computers – not laptops; these are, like, high-powered desktop computers – into a spare conference room in the space that was still being constructed and finished so that they could have undivided work time on the clamshell and finish the part.

* * * * *

"Eventually, we moved into that space, and they couldn't be quite that close anymore.  *But it was fairly typical for her to be, you know, working directly alongside engineers on that part and getting direction from them of, you know, what features to add, what steps to do next, how to advance the project*" (emphases added) (*Ibid.*, 780:19 – 782:7).[14]

---

[14]    Balan, while on the one hand claiming design responsibility for the clamshell, on the other admits that she did very little actual "engineering" work beyond her primary employment as a CAD/CATIA operator: "It is true that I was hopping [sic] to be and to have more a design engineer responsibility, but I tried to understand each time the reason why Tesla need me mainly as a Catia Expert and just from time to time an engineer" (Exh. 408).  *See, also,*

To the Arbitrator, the foregoing testimony is consistent with the way Tesla itself described Balan's work: it "require[d] precise calculation of the dimensions of each interface, each element perfectly placed and engineered" (Tesla Closing Brief, p. 2).  While Tesla's description of Balan's work may match the testimony, however, Tesla's conclusion about it doesn't.  The evidence established that, although Balan was an extremely talented worker with CATIA and other computer tools, she was primarily calculating dimensions – weights, thicknesses, heights, "detail work" – so that the clamshell would function as the engineers had designed; she herself did not design it.[15]  Although Balan described herself as being the person who "saved the Model S" (*see*, "Credibility"), the evidence doesn't bear this out.  The Arbitrator finds that Balan herself did not "engineer" the clamshell.  While Tesla points out much of Balan's self-serving testimony about how indispensable she was to the creation of the creation of the clamshell – Balan almost testified herself out of a favorable ruling on this issue – the physical nature of what she did in fact trumps the glorifying descriptions of it in her mind.  Balan designed tolerances and capacities in a component previously engineered by others. The evidence, viewed in its entirely, established that, no matter how talented Balan was in her capacity, whether denominated "CAD designer" or "CAD engineer," she did not actually do exempt engineering work during her work on the clamshells at Tesla.

Tesla points to two facets of the evidence that it argues establish that Balan was in fact an independent engineer, and therefore properly classified as an exempt employee.  First, Balan's initials were impressed on the final plastic clamshell that was used in the Model S (Tx., 720:7-17; 1665:10-14).  The existence of the initials is fine, but that doesn't establish within the parameters of California law that she actually "engineered" the clamshell.  She worked on the tolerances that went into making someone else's design work, and in so doing she "got direction from [the engineers] of … what features to add, what steps to do next, how to advance the

---

Exh. 104: "From now I promise I'll do just only the CAD drafter/person requests you hire me for" (grammar in original).

[15]      "I mean, the interesting thing about the clamshell is the original design, which was done by someone else…" (Tx. 701:19-21).

project" (Tx., 782:5 – 7). The existence of her initials on the clamshell is not probative of whether Balan was or was not an exempt design engineer.

Tesla's second argument is that Balan created a new way to use CATIA that even its creator, the French company Dessault, didn't know about. It's a method that Tesla uses to this day. This is compelling evidence, Tesla argues, that Balan was much more than simply a routine CAD or CATIA operator; she was an independent creator of novel engineering products. The Arbitrator is not persuaded.

Adverting again to the testimony of Peter Tennesen, the Arbitrator considered this description of Balan's CATIA modification:

"Q.    And what did her work entail?

"A.    Her work entailed – let's see. Her work was actually more complicated than it usually is for a CAD designer, because we needed her to set the architecture of the 3-D model and not just execute the 3-D model.

"So, you know, normally, if you have to make a 3-D model of a part, there's a single file in the computer that defines that part. And you add features to it, you subtract things, and modify it until it looks like the thing you want to produce.

"In this particular case, and with the clamshell, there were so many features and so much detail on it, that it wasn't feasible to do it that way. It would take too long to process and run the parts. So [Balan] developed a method of handling that, where you have sort of an architectural part that splits into smaller pieces, where multiple engineers and designers can work on it at once, which gets recombined again at the end.

"So she developed that and then also worked on the drawings in a more traditional CAD designer fashion" (Tx., Vol. III, 773:8 – 774:6).

While Balan deserves credit for coming up with a unique way of using the CATIA tool by breaking the grand design into smaller component parts and then recombining them after they had been separately modified, that does not transform her work into that of an independent engineer who is exempt from payment for overtime work. The Arbitrator concludes, based on his consideration of the evidence as a whole, that Balan's work during her first employment at Tesla was that of a non-exempt worker who was entitled to overtime, meal and rest breaks, etc. This moves us to the substantially thornier question of damages, the difficulty being caused not

only by Tesla's failure to keep accurate time records, but also by the factors identified in "Credibility."

      6.    **<u>Balan is Entitled to Be Compensated for Her Overtime Hours</u>:** The law is clear that if an employee has been misclassified as an exempt worker, that employee is entitled to be compensated for the overtime hours she worked but for which she was not compensated. Under California law, those number of hours would normally be calculated from the employer's records of time worked (*see,* Labor Code, §§ 226, 1174-1175). In this case, Tesla admits that it did not keep any records – let alone accurate ones – of the hours Balan worked, and consequently has no way accurately to calculate them (Tx., 113:22 – 115:3; 1511:20 – 1513:8; 1707: 12-14). Under these circumstances, the employee's only burden is to present evidence that will allow the finder of fact to determine the amount and extent of work performed as a matter of reasonable inference. Once that is done, the burden shifts to the employer to present evidence to negate the inferences to be drawn from the employee's evidence. It the employer fails to do so, the court (or arbitrator) may award damages to the employee based only on the inferences to be drawn from the employee's evidence, even though that amount is necessarily approximate (*Hernandez v. Mendoza,* 199 Cal.App.3rd 721, 726-28 (1988)). The Arbitrator is not bound, however, to accept without analysis the employee's assertion regarding the number of overtime hours she worked. It is appropriate for the Arbitrator to consider all of the evidence, direct and circumstantial, that bears on that question.

      During the hearing that focused on Balan's first period of employment, she introduced evidence that she argues establishes that she worked a total of 8,359 hours from 2011 to 2013, of which 2,444 were overtime hours (payable at 1.5 times her normal salary of $51.17 = $76.75/hour) and 932 were double pay hours (payable at twice her normal salary, or $102.35/hour) (*see,* Table 2, p. 14, of her post-hearing brief).[16] She claims that her total overtime for her first period of employment is thus $282,970. To this she adds $14,685 in meal and rest premiums. Finally, she calculates daily interest on the totals from September 13, 2011

---

[16]    Balan's employment letter attached to her Demand for Arbitration cites her annual salary as $105,000, while the April 10, 2012 letter introduced at the arbitral hearing grants her a yearly salary of $106,438. For purposes of this damages calculation, the Arbitrator accepts the higher salary cited in Exhibit 1.

to March 16, 2018 at $261,083, bringing her total lost wages claim for her first period of employment to $558,739.[17]

      **a.**    <u>**The General Quality of Balan's Evidence Regarding Overtime**</u>:  While the Arbitrator commends Balan on the quality of her CAD/CATIA work, he cannot say the same with respect to her testimony or evidence regarding the hours of that work or the nature of it.  As noted above in the "Credibility" section, Balan was prone to constant exaggeration, overstatement and embellishment, often vaunting herself into positions of unduplicable contribution.  At the Hearing, Balan testified that virtually every other witness who testified was a "liar,"[18] and that she was the only person who presented believable testimony.  As noted above (p. 5, fn. 5, *supra*), she described herself as "the engineer that came up with how to save the Model S,"[19] and attributes the fact that her initials are set into the clamshell mold "as a recognition for my work to make possible these extraordinarily intricate parts."[20]

      **b.**    <u>**Schedule B to Balan's Post-Hearing Brief**</u>:  Schedule B to Balan's Post-Hearing brief purports to be a calculation of all the overtime and double time hours Balan worked during her first stint at Tesla.[21]  For the reasons set forth below, the Arbitrator does not find that this Schedule, or the cited testimony in support, is either credible or reliable.

---

[17]    *See, also,* Balan's summary of damages found at pp. 13 – 16 of her Post-Closing Brief.

[18]    *See,* footnote 6, p. 5, *supra*.

[19]    (*see,* "Credibility").

[20]    Tx., 1665:10-14.

[21]    Surprisingly, during the September 13, 2018 teleconference on attorneys' fees, when the Arbitrator asked how he should treat the massive and demonstrable inaccuracies in Schedule B in connection with his calculation of attorneys' fees, Claimant's counsel argued that Schedule B was "not really an attempt to be accurate," but was more in the nature of a "demonstrative exhibit" that counsel prepared to make Claimant's testimony regarding her overtime hours "more accessible."  (Quoted language from the Arbitrator's notes taken during this teleconference.)

1.     **Schedule B's Calculations are Unreliable and Greatly Exaggerate the Likely Overtime Hours that Balan Actually Worked:**

Schedule B sets forth the "evidence" that Balan uses to support her argument that, excepting only a few weekends and an occasional Sunday, she worked *precisely* 4 hours of overtime *every single day* from January 13, 2011 through January 17, 2013.[22] The Exhibit (which frequently cites to the same conclusory hearing testimony to support vast bulks of time entries)[23] never suggests that Balan worked 1, 2 or 3 hours of overtime on any particular day; it was exactly 4 hours of overtime per day.[24] Moreover, never was there a day during her first employment (excluding some weekends and a few Sundays) when Balan *didn't* work overtime. Similarly, for her alleged Double Time Wages, Exhibit B asserts that Balan worked either precisely 2 hours (if the alleged double time was on a weekday), or precisely 14 hours (if the double time was on a weekend). That means that, (based on the Arbitrator's hand-counting of the entries) excluding only 18 out of 104 weekends during the two year period covered by the Exhibit, plus an additional 52 Sundays during the same time frame (and further excluding those days where Balan claims she worked 24 hours straight (*see*, pp. 17-18, *infra*)), Balan spent either

---

[22]    Oddly, in its only deviation from the norm, Schedule B reports that Balan worked 16 hours on April 29, 2011, 19 hours on April 30th, and **12.5** hours on May 1st. However, the total hours (overtime plus double time) claimed for those same dates are 16 for April 29th (her claimed overtime and double time hours add up here), 19 for April 30th (her overtime and double time hours only add up to 16), and 12.5 for May 1st (her claim is for 14 hours double time). These irregularities exemplify the unreliability of Schedule B.

[23]    For example, many of the time entries on Schedule B cite the Arbitrator to Balan's testimony at Vol. 1, 193:25-194:8 as support. That testimony is:

"Q.     How many hours did you work on average a day. Two and a half years. I know it's hard, but …

"A.     There – an average. Like I would say, 12 – no. Averages --- averages, the highest and the lowest, type of thing? Because we had a really, really tight, you know, things that we have to finish, and that I work even 26, 28 hours straight. And normally we had like 12 hours per day, normal. 10 to 12. So average, I don't know."

[24]    Significantly, according to Schedule B, there was never a day that Balan worked that she did *not* work at least 4 hours of overtime. This is inconsistent with Balan's own testimony (*see*, fn. 13, *supra*: "And normally we had like 12 hours per day, normal. *10 to 12*. So average, I don't know."), as well as the testimony of the Tesla managers who supervised her (*see*, pp. 21-23, *infra*).

unerringly 12 or unerringly 14 hours a day at the Tesla factory,[25] calculated according to one of the following three formulas: (she spent either (1) 8 regular hours plus 4 hours of overtime = 12 hours/day; or she spent (2) 8 regular hours plus 4 hours overtime plus 2 hours double time = 14 hour/days; or (3) she spent a flat 14 hours/day of double time.)  Besides being inherently unbelievable,[26] the Arbitrator finds that Balan's conclusions re hours of overtime worked find scant support when the entire record is analyzed.[27]

On his own, the Arbitrator has found the following examples of inaccuracy in Schedule B.  That Schedule identifies nine Fridays where Balan claims that she worked around-the-clock for 24 hours.[28]  Combining any one of those 24-hour work-days with the day after (typically claimed as at least a 12-hour work day), Schedule B argues that there were nine days when Balan spent an uninterrupted 36 or 38 hours on the job.  Even the testimony that Balan refers to in Schedule B doesn't support this: "… and that I work even 26, 28 hours straight."  Her claim in

---

[25]     As noted at pp. 20, *infra*, during ten months of this time Balan was working partially at the Tesla facility in the Bay Area, but partially on her own at her residence in Seattle, WA.  Balan's calculations assert that she invariably worked the same number of hours no matter where she was.

[26]     In connection with her resignation from Tesla in January 2012, Balan wrote HR on January 2, 2013 that her son had been sick with a bad infection and a 103 temperature.  She said he had been "in and out of the ER for the past week" (Exh. 428).  She also told HR that she was not sure "if I will be able to be in the office for the next week" (*Ibid.*).  It seems to the Arbitrator perfectly natural that a mother would be with her seriously sick son during such an illness, yet Balan's Schedule B claims that she worked 12 hours per day every day but one (Sunday, December 20, 2012) during the week preceding her January 2, 2013 email, plus 12 hours every day following (excluding Sunday, January 6, 2013), the week she told HR that she would not be able to be in the office because she was tending her sick child (Exh. 428).

[27]     Much of the record flat-out contradicts Balan's overtime claims.  Citing random examples, in an email dated December 12, 2011, Balan writes that she "will be in after lunch."  Nevertheless, on Schedule B she claims that she worked a full 8 hours, plus 4 hours overtime on that day.  On November 14, 2012, she advises her supervisor that she will be in "after lunch," because she had "something to take care [of] this morning and is taking longer than expected."  Yet on Schedule B, she asserts that she worked an 8-hour day, plus 4 hours of overtime.  On November 29, 2012, she writes to advise that she will be in after 2PM the following day (November 30th).  Yet in Schedule B she again claims that she worked 8 hours plus 4 hours overtime on November 30, 3012.  On May 4, 2012, she writes to advise that she is having "car problems," and will therefore be in "around lunch."  Yet again, for this day she claims entitlement to four hours of overtime in addition to her working day of 8 hours.  (*See,* emails collected in Exh. 402).  These examples – and there are many more – materially undercut the reliability of Balan's claimed overtime hours.

[28]     On Friday June 24, 2011, the Schedule indicates 12 hours of double time which, combined with an 8-hour workday plus 4 hours of overtime, yield 24 hours of work on that day.  Ditto Friday, July 1, 2011, Friday, July 8, 2011, Friday, July 15, 2011, Friday, November 4, 2011, Friday, November 11, 2011, Friday, November 18, 2011, Friday, November 25, 2011, and Friday, November 2, 2011.  In each case, Schedule B asserts that on the next day Balan worked an additional 12 or 14 hours, extending her working day to a straight 36 or 38 hours.

Schedule B that she worked longer hours (up to 36 or 38 straight) finds no evidentiary support in the hearing testimony, not even her own.

In addition to Balan providing only a thin layer of evidentiary support for her positions, testimony from other parts of the record casts serious doubt on Balan's claims. In part because she was (albeit inappropriately) treated as an exempt employee, Balan was given extraordinary freedom in using and scheduling her own time. As a result, according to many Tesla witnesses who testified on the subject, Balan would spend a great of time talking on her telephone, taking extra-long lunch breaks, arriving late and leaving early, wandering around the factory floor chatting with other workers, spending her time on projects that hadn't been assigned to her (concomitantly falling behind on her scheduled projects), and generally being a less-than-efficient user of time. While the Arbitrator recognizes the issue of bias and self-interest in this testimony from Tesla managers, the consistency with which it was given by numerous of Balan's supervisors and co-workers is compelling.

Ernesto Villanueva was her most direct supervisor during her first period of employment. He testified that he had great difficulty getting Balan to focus on assigned projects. He said that she typically waited until the deadline for a project was "looming" before she seriously applied her considerable talents to it. Villanueva testified that he consistently tried to get Balan to focus on projects to avoid what Balan described as a last minute "push" or "self-generated crises at the end" that was often needed to complete a project (*Id.*). Unfortunately, according to Villanueva, Balan continued down this path:

> "A.      I mean, I do have to say, with [Balan], we really pushed on her to try to even out the workflow so that it wasn't this big push at the end. And, to be frank, it was not the easiest thing for her to do.

> * * * * *

> "But her – you know, there was a number of absences, and then just – there was just – where she wasn't doing high output sort of at the beginning and then making somewhat sort of self-generated crises at the end during these pushes.

> * * * * *

"But her – you know, there was a number of absences, and then just – there was just – where she wasn't doing high output sort of at the beginning, and then making somewhat sort of self-generated crises at the end during these pushes.

\* \* \* \* \*

"Q.   That's what I'm asking about.  Tell me about the issues you had with her.

"A.   It was just not consistently being at work, not – sort of working – not, like, eight-hour days, but you, know, nine-hour days over long periods of time – or ten-hour days, so that the peak that would be at the end would not be 24 hours or several days in a row of working.  That's what I was trying to push her to.

"Q.   Right.  But what I'm asking you is what did you observe were the challenges to getting her to revolve that?

"A.   Yeah.  I mean, her cell phone usage was one of the things that I had problems with, of texting on a regular basis, taking phone calls.

"You know, it's a social group, but I felt that she talked excessively with her coworkers.  I was wondering a little bit whether that was the team dynamic, but then I did get complaints from some of her coworkers that she did talk excessively to them and that – especially sort of in the middle before crunch time.

\* \* \* \* \*

"Q   Did you observe, did she have any habits particularly regarding her punctuality?

\* \* \* \* \*

"A.   When I say there were times when she wasn't working long hours, you know, sometimes she would come in late.  Sometimes she would leave for lunch and then be gone a long time" (Tx., 696:15 – 699:10).

Similarly, although this testimony was provided by Jared Nussey, Balan's supervisor during her second period of employment with Tesla, it corroborates Balan's general working style:

"Q.   What was Ms. Balan's work style like?

"A.   I wouldn't – her work style.  She was difficult to track down.  She would come in late, leave early.  She'd talk to – she was very social.  She'd talk to anybody as they walked by.  So it was difficult to get work out of her.

"Q.   How would you assess her time management skills?

20

FINAL AWARD-CORRECTED

"A.      I would say she wasn't in command of her – I wouldn't say she had very good time management skills at all.  Most of the projects that I'd assigned her were late by weeks" (Tx., 1691:7 – 18).

Taking the testimony on the subject of Balan's work ethic at Tesla as a whole, the Arbitrator finds that while Balan clearly worked long hours from time to time, her position that she unswervingly worked 12, 14 or 24 hours per day (with an occasional weekend or Sunday off), plus nine days where she worked a straight 36 or 38 hours, is not believable.

### ii.   Tesla Offers Balan a Stipend That Balan Does Not Account for in Her Damages Calculation:

As discussed more fully below, Claimant had an unenviable record of resigning and then retracting her resignations while at Tesla.  One of her first such "resignations" occurred on February 12, 2012, when she resigned in writing because she needed to be with her family, who were having trouble immigrating into the US from Canada.  She claimed that she needed more money so that she could be up in Seattle, WA, where she would be close to her family in Vancouver.  In order to address Balan's need for additional money to be in Seattle from time to time, Tesla granted her a temporary stipend of $2,000 a month for a period of ten months, or $20,000 total.  In addition, Tesla paid for Balan's travel between the Bay Area and Seattle.  (The value of these payments was not introduced into evidence.  That is a failure of evidence on Tesla's part and will not be deducted from Balan's total damages award.)  The evidence established that Balan worked from home in Seattle for approximately half of that ten-month period.  Two features are important with respect to this stipend.

First, Balan does not account for the extra $20,000 in her damages calculation.  She claimed in her post-hearing briefing that that the $20,000 should be treated as a salary increase, a position the Arbitrator has rejected.  Therefore, since the stipend functioned as an indirect form of overtime pay, it must be taken into account.  Second, and more significant to the Arbitrator, is the fact that, through Schedule B, Balan claims that for the entire period from February through December 2012, when she was her own "boss" at home in Seattle for about 50% of the time,[29] she worked at least four hours of overtime per day (excluding a few weekends, although on

---

[29]     "So the level of supervision … went down during that time period" (Tx., 70717-19)

many of those she claims that she worked 12 hours on Saturday and only took Sunday off).[30] This is not credible, and further undermines her assertions regarding the total number of overtime hours she worked overall. Moreover, the purpose of her temporary residence in Seattle was to be with, or in some way to help, her family. The Arbitrator assumes that she did so. Assuming her claim of long working hours while in Seattle is true, however, taking "time off" to attend to familial responsibilities would have been virtually impossible. The alternative, which the Arbitrator accepts, is that she did take the needed off to be with her family and did not work the overtime hours claimed.

### c. Balan Does Not Take into Account any Days She Missed from Work Due to Illness, Vacation, Etc.

Excluding only a few full weekends or the occasional Sunday, Balan claims that she worked every single day of the year during her first period of employment, a time stretch in excess of two years. Not only that, she never once worked a single 8-hour day; According to the largely discredited Schedule B, every day she worked she put in at least 12, 14 or, occasionally 24 hours of work. This claim is not only inherently not credible; it was contradicted by the evidence.

While Balan didn't directly testify that she never took a day off during her employment at Tesla, her calculation of overtime hours in Schedule B makes that point. Her supervisors disagreed:

- Villanueva: "Not, like, specific dates, but I know she took time off" (Tx., 747:15-16);

- "Q.   Now, you said also that she had some absences, correct?

  "A   Well, absences in the sense that, you know, she would work, you know, maybe an hour or two, you know, during a day when the expectations were more than that, you know, eight hours in a day" (Tx., 748:2 – 8)

- Geiduschek: "Again, her hours were erratic. Sometimes she would stay for a hard push, and sometimes she would come in at noon for days on end and leave early. Again, very erratic" (Tx., 1512:18-21);

---

[30]   She also claims that she is entitled to meal and rest periods for the time when she was working from home and had free reign regarding the hours she worked, the meal and rest breaks she took, and when she took them. Balan made her own decisions regarding meal and rest breaks while in Seattle and will not receive an award for any allegedly denied meal breaks during that time.

- "Her absenteeism was mostly due to her health.  So she would take days off.  She would call in sick at the last minute.  I would say okay, but we have a fairly, I will say, limited allowance for personal time off at Tesla, fifteen days every year.  And I felt that this was going to become something that was taken advantage of.

                              * * * * *

  "Q.    And to your recollection, she took her allotment of days every day when she worked with you?

  "A    To my recollection, yes.  She was pushing the limit (Tx., 1473:12 – 1474:14);

- "My impression and recollection is that she took all of her days off, that they were bouncing off the bottom to the – sort of – we're allowed to go five days into the negative before the system starts to complain at us, and that's where she had to stay.  So she definitely too – she definitely used her accrued time off" (Tx., 1476:16-24);

- Raczkowski:[31] "But when [her attendance] started affecting things is she would schedule meetings with people, you know, for like 8:30, 9:00 a.m. in the morning, and … then she wouldn't show up for the meeting.

      "And then I would email her, asking where she was, and she was like, 'Oh, I'm running late.' Or, you know, 'I can't come in until a certain time.'

      "And there was no prewarning on that, right?  And that happened, you know, multiple times.

      "And then we had a couple instances – I think it was January 2014 where she scheduled a meeting, and we call into the meeting – this was like 3:00, 4:00 in the afternoon, so a fairly reasonable time for somebody to be in the office.

      "And we said, 'Hey, we're waiting for you at this meeting.  Are you going to show up?  Where are you at?

      "And she was like, 'Oh, I had to head home.  I spilled something on my blouse.' And accidents happen, but it was like the second time that that happened within a month.

      "And then, you know, there were other instances where she would – you know, it would be like 10:00, 11:00 on a Monday and she hadn't shown up today.  I was like, 'Are you com[ing] in today?  We have stuff that we need to discuss.'

---

[31]     Raczkowski was Balan's supervisor during her second period of employment, but it appears to the Arbitrator that Balan's work habits were similar for both periods, so the cited language is equally apposite.

"'Oh, I won't be in until noon today.'

"And there was no, like, prior warning that she wasn't going to be in" (Tx., 1023:14 – 1024:21);

* * * * *

"...it was a lot of concerns that I had with Ms. Balan, with either she was not completing her job or, you know, missing time. So things that were affecting her attendance" (Tx.,1074:2-6);

- Allen:[32] "So she would repeatedly take time off. She was always coming in late. She would disappear. She would take days off. She would say, 'I'm going to be an hour late,' and then she'd turn up in the afternoon. She would take a day off and then say, 'I'm having today off'" (Tx., 919:16-21).

- Nussey:[33] "She was difficult to track down. She would come in late, leave early" (Tx., 1691:7-10).

While the foregoing does not flatly establish the number of days or hours Balan was away from the office due to personal issues, it does establish that there were some, in fact, many. The Arbitrator will factor this finding into his conclusions regarding the total number of overtime hours to which Balan is entitled.

7.   **Balan is Entitled to be Paid for the Overtime Hours that She Did Work:**
Notwithstanding her testimonial exaggerations, the evidence does establish that Balan did work overtime and double time during her first period of employment with Tesla, and she is entitled to be compensated for it. Moreover, even though Balan may have been highly inefficient during the hours she worked, that is a management control issue for Tesla, and will not be a "dock" on the number of hours that Balan worked. Taking into account Tesla's wrongful classification of Balan as an exempt worker, the concomitant difficulty that that created for Balan re keeping accurate records of her overtime hours, and the undeniable fact that she did work some overtime and double time, balanced against Balan's hyperbolically inflated testimony regarding her actual overtime hours, the Arbitrator finds that an award of 950 hours of actual overtime, plus an

---

[32]   See footnote 31, *supra.*

[33]   See footnote 31, *supra.*

additional 300 hours of double time, is supported by this arbitration record.[34]  Balan's salary was $51.17 per hour,[35] so her overtime (time and a half) salary will be $76.75 per hour.  That yields an award of $72,912.50 in awarded overtime.   Her double time salary was $102.35 per hour,[36] which yields a double time award of $30,705.00. This totals an award of $103,617.50 in flat overtime/double time salary for her first period of employment at Tesla.  This total must be reduced, however, by the $20,000 stipend that Tesla granted her during that time period, which the Arbitrator finds must be treated as partial payment of the overtime Balan was due, not as a salary increase.[37]  The Arbitrator thus awards Balan $83,617.50 in overtime/double time for her first period of employment, plus interest.

8. **Balan's Second Period of Employment**:  Balan left Tesla following her first period of employment on January 18, 2013.  Shortly thereafter, on July 16, 2013, Balan was rehired by Tesla, this time in the position of "Sr. CAD Engineer – Interior Systems" at a higher salary than her first employment (Exh. 66).  As her job title suggests, she was assigned to the Interiors team, a highly prestigious position that focused on the visible interior "look and feel" of the car.  Her immediate supervisor was Andrew Raczkowski, and his supervisor was Derek Allen.  Within a very short time, Balan's relationship with this supervisory team went south, to the point where she accused them of forcing her to "lie" to cover up "their mistakes."  The evidence surrounding this persistent imbroglio is discussed in more detail below.

The nature of Balan's work during her second period at Tesla was in many respects similar to her first, the primary difference being that she worked on several discreet interior

---

[34]     Tesla introduced Exhibit 533, which it describes as a compilation based on the "first and last" emails that Balan sent out each day, that Tesla asserts supports a maximum of 373.88 hours of overtime and 91.67 hours of double time during Balan's entire employment with Tesla.  Had the evidence established that, in fact, the first thing that Balan did upon arriving at work was send out an "I'm here" email, and that the last thing she did was send an "I'm leaving" email at the end of the work day, this exhibit might have had some probative value.  The evidence fell far short of this needed threshold, however, so the Arbitrator will accord this exhibit minimum weight.

[35]     This number is taken from Balan's post-hearing brief, and it was not challenged by Tesla.  The Arbitrator accepts it as accurate.

[36]     See footnote 35, *supra*.

[37]     The Arbitrator rejects Balan's argument, advanced for the first time after the Interim Award had been issued, that the $20,000 should be treated as an increase in salary.

FINAL AWARD-CORRECTED

projects instead of simply the battery "clamshell." Those projects included the so-called "A-Pillar Lit Sill," the Headliner, the Sunvisor, and the Coathook. As with her work on the clamshell, most of her work on these projects involved using the CAD and CATIA programs on the computer, although she additionally worked with other Tesla employees as well as the suppliers of the parts she was designing. Her job was classified as exempt, and she was not compensated for overtime.

While this question is closer than was the case with her first employment with Tesla (it appears that in the interiors unit, unlike the battery unit, Balan was not first given the design of the part in question and asked to calculate the tolerances), the Arbitrator continues to find that Balan's work with the Interiors team was primarily computer design work; she should have been classified as a non-exempt employee. Again, however, her exaggerated descriptions of her work raise serious questions about her proof of overtime hours.

Balan argues that Table 3 (p. 15 of her post-hearing brief) accurately sets forth her overtime (664 hours) and double time (208) during her second period of employment. She asserts that this chart is supported by Schedule C[38] to that brief. Schedule C is reminiscent of Schedule B, although here Balan's claims for daily overtime vary between 3 and 4 hours (instead of exclusively 4, as was the case in Schedule B), with the occasional single hour of overtime worked on selected Saturdays. When she worked on a Sunday, her claimed double time is typically 9 hours. However, as with Schedule B, Balan's testimony in support of her alleged overtime hours is simplistic and conclusory.

As was the case with her first period of employment, Balan's supervisors and co-workers testified that she frequently arrived late, took overlong lunch breaks, spent lots of time talking or texting on her phone, and otherwise did not constructively use her time.[39] While her

---

[38]    During the teleconference on attorneys' fees, Balan's counsel lumped Schedules B and C together (*see,* fn. 3, *supra*), as merely "demonstrative" exhibits, not affirmative professions of what the facts showed based on the cited Hearing testimony. The Arbitrator accords this post-Hearing characterization minimal weight.

[39]    On April 7, 2014, her then-supervisor, Derek Allen, sent an email to HR regarding Balan's attendance and work habits (Exh. 213). On the second page, Allen presented HR with a log that he had been keeping to track Balan's failures to put in a full day of work. He cites 27 specific days between July 19, 2013 and February 14, 2014 when he claims Balan either missed work entirely or arrived late/left early/took excessive lunch breaks, etc. For every one of these days, Balan (*see,* Schedule C) argues that she worked a minimum of 11 hours, or as many as 14

mismanagement of time while at Tesla is again a responsibility of Tesla management and will not be taken into account when calculating Balan's actual hours of overtime and double time, the testimony regarding her missed days of work as well as her failure to appear for work on time, to take excessively long lunches, and to leave early will reduce her claimed hours.

Otherwise, again excluding the odd weekend or Sunday, Balan unconvincingly claims that she worked every day during her second employment at Tesla.[40]  Taking into account the totality of the evidence, and again giving Balan the benefit of the doubt because of Tesla's mischaracterization of her as an exempt employee and failure to keep accurate hourly work records, the Arbitrator finds that this record supports an award of 300 hours of overtime and 90 hours of double time during her second period of employment.  Balan's hourly pay during her second period of employment was $53.85.[41]  Her overtime wages are thus $80.76 ($53.85 x 1.5) and her double time wages are $107.70 ($53.85 x 2).   Balan is awarded overtime for her second period of employment in the sum of $24,228, while her double time wage award is $9,639, for a total wages award for her second period of employment of $33,921.

9.     **Balan's Claim for Unpaid Meal and Rest Breaks**.[42]  Under California law, all non-exempt employees are entitled to prescribed, uninterrupted breaks for meals and rest breaks. When asked if she was ever disciplined for taking meal breaks, Balan testified, at obvious odds with the record: "I was not allowed to take them" (Tx., 1969:20-22).  She thus seeks damages for an incredibly denied 387 times when she was denied a meal break.  The Arbitrator does not

---

hours.  Some of the days should be very easy to verify.  For example, Allen claims that Balan was in the hospital and missed a full day on each of October 7, 8 and 9, 2013.  Yet Balan claims that she worked 13 hours on each of those three days.  The second page of Allen's email (Tesla 1298) is entitled "Discussion with Christina [sic] Balan regarding performance and working hours," and contains numerous bullet points regarding Balan's work practices, including arriving late, leaving early, working on unapproved projects, taking longer that authorized lunch hours, etc.  Allen testified that he and Raczkowski had a meeting with Balan in February 2014 where the three talked about Allen's cited concerns with Balan's dilatory work habits (Tx.,917:3 – 829:2).

[40]     Schedule C indicates that Balan took one day of Personal Time Off ("PTO") on Thanksgiving Day, 2013, plus a week of PTO from Christmas through New Year's 2013/14.  She does not claim overtime for those days.

[41]     See footnote 35, *supra*.

[42]     As noted in footnote 1, *supra*, Balan now seeks to add some $20,000+ to her damages for alleged waiting time penalties relating to her second period of employment.  For the reasons stated, those claims were abandoned and have been waived.

FINAL AWARD-CORRECTED

credit either this testimony or the damages claim associated with it (*see,* Credibility).  The record is riddled with evidence not only that Balan took regular meal breaks, but that she frequently took unacceptably long ones.

This does not mean, however, that there might have been times when Balan, had she been properly classified as a non-exempt employee, was in fact denied a meal or rest break.  Her first supervisor, Villanueva, indirectly acknowledged as much:

"Q.   Did you ever have discussions with her about meal periods?

"A.   No.

"Q.   Or lunches?

"A.   I can only think of a case where she was working – was trying to push through lunch.  I don't know if – but where she was pushing off lunch so that she could meet with someone.

       "But in that case, I was pushing her to take lunch because, you know, when you get hypoglycemic you tend not to function very well.  That's the only case I can think of (Tx., 701:4 – 15).

Considering the totality of the evidence, the Arbitrator finds that the record supports a total of 55 hours missed lunch breaks during her first period of employment ($4,221.25) and 10 hours of missed lunch breaks during her second period of employment ($538.50),[43] for a total award of $4,804.75.

**10.     Balan is Entitled to Interest on her Wage Loss:**  The Arbitrator has awarded Balan a total of $117,538.50 in unpaid overtime and double time wages, plus $4,804.75 in missed meal/rest breaks, for a total of $122,343.25.  Under California law, Balan is entitled to interest on her unpaid wages.  Counsel are directed to meet and confer and to stipulate on the total amount of interest that applies to the unpaid wages awarded by the Arbitrator, using the formula that the Arbitrator has provided in Section 22, below.

---

[43]     While the Arbitrator finds that Balan's misuse of time on the job is an issue for Tesla's management with respect to total overtime hours, that does not extend to meal and rest breaks.  Particularly during her second period of employment, the Arbitrator finds that Balan materially misused her time on the job, following up on pet projects rather than taking meal or rest breaks.  This is not a failure on Tesla's part to provide the required break/rest periods. It is Balan's conscious decision to use her otherwise-provided meal or rest time for different purposes.

FINAL AWARD-CORRECTED

11.     **Balan's Claim of Wrongful Termination from Her First Employment**:  Balan also seeks damages based on her claim that she was wrongfully terminated by Tesla at the end of her first period of employment.  The facts established by the evidence regarding this claim are hotly disputed by the parties.

a.     **Balan Resigns for the First Time**:  In December 2011, Balan got into a personal conflict with a co-worker, Nathan Chidiac, who she thought was getting more credit than she for work on the clamshell (*see*, "Credibility").  She complained directly to Geiduscheck and told him that she was going to quit.   On December 20, 2011, she submitted her written resignation (Tx., 1466:2 – 16; Exh. 407).[44]  Geiduscheck assured Balan that she was a valued employee and, with her ego temporally assuaged, Balan withdrew that resignation and continued working at Tesla.

b.     **Balan Resigns for the Second Time**:  On February 16, 2012, Balan resigned from Tesla for the second time (Ex. 408).  This time, she claimed that her family was having trouble immigrating to America from Canada, and she needed to find a more remunerative job so that she could take care of them.  Instead of accepting Balan's resignation, Geiduscheck negotiated on Balan's behalf to obtain a temporary, $2,000/month stipend (plus covering her travel costs between the Bay Area to Seattle, WA), so that her financial problems would be alleviated, and she could stay in Tesla's employ.  The stipend, which functioned as an advance payment against overtime, ran from March through December 2012.  During this time, Balan received in the normal course a grant of 2,000 stock options that would vest according to a pre-determined schedule (Ex. 14).  She was highly satisfied with this arrangement and continued working at Tesla.

c.     **Balan Resigns for the Third Time**:  Balan's $2,000/month stipend was scheduled to expire in December 2012.  In November of that year, Balan asked that the stipend

---

[44]     Balan disingenuously argues that this was just a "Christmas vacation email from Balan" who was about to "take a well-deserved holiday break" (Balan Rebuttal Brief, p. 11).  That description is not only belied by the facts, it is countered by the text of the email itself: "As you all know tomorrow is my last day, I will be in just until noon" (Exh. 407).  Moreover, the remonstration in her brief that she was about to take a "holiday break" notwithstanding, in the increasingly unreliable Schedule C, she seeks $3,377 in overtime hours worked from December 20, 2011 through December 31, 2011, taking only Christmas Day off from work.  This claim does little to support her argument that, on December 20, 2011, she was about to leave for a "well-deserved" holiday.

FINAL AWARD-CORRECTED

be extended so that she could continue to support her family.  When Geiduscheck declined the request (Tx., 1457:25 – 1458:9), Balan resigned for the third time (Exhs. 30, 418).  This time she announced that her employment would end on December 30, 2012, which corresponded to the last day she would get her stipend.  Shortly thereafter, however, she extended her termination to January 18, 2013 (Exh. 428; Tx., 1644:21 – 1646:19).  The interchange between Balan and Tesla management during this time is instructive.

When Balan first resigned, she had previously asked Geiduscheck to have Tesla reclassify her as a non-exempt employee, thus entitling her to overtime pay.[45]  Tesla, as the Arbitrator has already found, inappropriately denied this request.  She then tried again with Villanueva (Exh. 35; Tx. 1625:1-7) with the same result.  Shortly thereafter, however, on December 17, 2012, she told Geiduscheck not to follow up on her earlier suggestion because she had a better idea: she would have Tesla extend the stipend, work from her home in Seattle as an independent contractor and have Tesla pay for her car, food, hotel and airfare should she need to be on site (Tx., 1628:4-22; Exh. 38).  She followed up by contacting Helen Barker in Tesla's HR Department, where she proposed "to move to a different group as a contractor…" (Exh 40).  Oddly, she asked Barker not to talk with either Villanueva or Geiduschek about her proposal, but rather to keep it "just between us" (*Ibid.*).[46]

It is not clear whether Barker talked to either Villanueva or Geiduschek about Balan's request.  It is clear, however, that Villanueva was becoming concerned about Balan's deliberate machinations:

> "[Balan's] lack of professional maturity has greatly undermined her effectiveness.  It seems to take … a self-created crisis to get her to focus.  The most difficult issue has been repeated breakdowns due to a perceived injustice that usually come just a few weeks from the end of a project.  During these periods her output ramps down to zero and she becomes fairly irrational about the company's perception of her worth…" (Exh. 41)

---

[45]    There is a dispute in the evidence about how many times Balan sought to reclassified as a non-exempt employee.  The Arbitrator does not find the number of times she made the request to be reclassified; the salient point is that Tesla declined the request(s).

[46]    Adding to the cumulative evidence undermining the reliability of Schedule B, in Exhibit 40, which was written on December 21, 2012, Balan tells HR that "I had to leave to Vancouver today…" but in Schedule B she claims that she worked a full 8 hours, plus 4 hours overtime on the same day.

When Tesla refused Balan's request to extend her stipend, Balan conducted a "good-bye" tour around Tesla. Balan described her co-workers' reaction to the news that she was leaving thusly: "All of them are so optimistic that Tesla … will not let me go, they keep saying that something is really wrong if they do that after what I did for the company. They were so sweet they even told that if I'll leave, they'll start looking somewhere else" (grammar in original) (Exh. 40) (*see,* Credibility).

On January 14, 2013, 4 days before her then-scheduled last day at Tesla, Balan told Geiduschek that her mother had suddenly agreed to pay her own living expenses for the next six months, which meant that Balan would not have to support her family and, thus, could continue working at Tesla (Tx., 259:21 – 260:4). Balan was thus retracting her resignation. Geiduschek informed HR (Exh. 429), who told him that Balan needed to verify the retraction of her resignation via email (Exh. 47). When Geiduschek's boss, Villanueva, learned about this, however, he was not happy:

> "The last month's theatrics left a bad taste in everyone's mouths…I think we ended up bending backwards for her and she hasn't been very sensitive or appreciated of this, playing the victim, and this has been detrimental to the work environment for others" (Exh. 50)

Villanueva acknowledged that Balan possessed skills that would be helpful to Tesla but said that he did not want her working on the battery team any more. He suggested that one possibility might be to move her "to one of the vehicle teams," but he indicated that she would no longer be working on the clamshell (*Ibid.*)

Superimposed on the foregoing, and central to Balan's claim for wrongful termination from her first period of employment, is Balan's visit to her doctor for a mammogram, which occurred in mid-January 2013. The attending technician (not a medical doctor) told Balan that the results "could or could not be cancer," but that a specialist would have to review the films and give Balan a definitive interpretation. That evening, Balan attended a farewell party for a battery team employee that was attended by "the entire CAD team" (Tx., 282:16-17). She was upset about her mammogram and told everyone there that she might have cancer (Tx., 286:16 – 287:24). It's not clear if either Villanueva or Geiduschek was present, but Helen Barker from HR was not.

Although the timing is a bit fuzzy, Geiduschek determined that he had had it with Balan's "theatrics" that he found were detrimental to her work environment:

31

FINAL AWARD-CORRECTED

"Her work ethic and her behavior on her team was counterproductive. It was sometimes maybe rash, quitting in a huff. She was highly distractible, not very focused. She had conflict with her team. She was perhaps showing – you know, constantly looking for praise. And, yeah, she was just, in many ways, unprofessional" (Tx., 1468:3-10).

Because of this, Geiduschek, in conversations with Barker from HR, "...made the value judgment that, on balance, it was no longer to our benefit to let her rescind her resignation" (Tx., 1464:11-16; see, also, Tx., 1465:16-20). Both Geiduschek and Barker testified that they had no idea that she had recently had a mammogram, and that the decision to let Balan go was not in any way based on her medical condition (Tx., 1470:21 – 1471:5; 1326:17-23; 717:4-7; 1583:23 - 1584:3, 7-10).

Balan's exit interview was scheduled for January 18, 2013. Both Geiduschek and Barker participated. Balan testified that when Barker entered the room, she had a yellow "sticky" on her file cover that referred to the possibility that Balan may have cancer. Balan claims that she was stunned when she saw this, and now asserts that she was actually terminated from Tesla because she had this disease. Both Barker and Villanueva testified that Balan voluntarily told them for the first time that she "might have cancer" during the exit interview, and that this news came as a shock to both of them (see, citations at end of previous paragraph). Barker, as head of the HR department, testified that when she learned that a departing employee may have a serious medical problem, it would be routine for her to refer that employee to the appropriate medical resources so that, post-termination, the employee would have access to the proper medical care. Barker testified that that's what she's sure she did with Balan. She denied that she walked into the interview room with a yellow "sticky" on her files.

Balan contends that her exit interview proves that Tesla terminated her because of her medical condition. She also asserts that her termination was because she had asked Tesla to reclassify her as a non-exempt employee. Neither of these claims is supported by the evidence.

The evidence established that Balan, while undoubtedly an exceptionally talented worker with CAD and CATIA, was also very manipulative of her circumstances, and equally demanding of attention and personal attribution in connection with her work. Viewing the evidence in its totality and giving Balan the benefit of the doubt whenever the evidence is in equipoise, the Arbitrator concludes that Balan frequently, intentionally, and through different approaches manipulated her situation to gain personal advantage. On the point directly in front of the Arbitrator, he finds that the evidence did not establish either that Balan was discriminated or

retaliated against because she sought to be classified as a non-exempt person or because she had a possible cancer diagnosis. Rather, the evidence convincingly confirms that Balan purposefully created tragic scenarios in which she became a victim of circumstances beyond her control, and then sought to gain ameliorating benefits from others because of it. It does not matter for purposes of this analysis that, with respect to the non-exempt issue, Balan was correct as to her appropriate classification. The evidence does not support the contention that Balan was wrongfully terminated from Tesla after her first period of employment because she had requested a reclassification, because she might have a medical condition, or for any other improper reason. Balan voluntarily resigned from Tesla, several times, and ultimately that resignation became effective. The Arbitrator finds, as a matter of fact and law, that Tesla did not discriminate or retaliate against Balan in connection with her voluntary resignation from Tesla following her first period of employment there.

12.    **Balan's Resignation Following Her Second Employment with Tesla**: The most convincing evidence that Tesla didn't terminate Balan the first time because she sought reclassification or because she might have cancer is the fact that it rehired her a scant few months following her initial termination: she was doing much the same work, she was again classified as exempt (which brought with it her complaints about misclassification), and her cancer issue was fully known.

When Balan was rehired in June 2013, she was put into the "interiors group." This employment stint at Tesla would prove to be shorter than the first, and again Balan argues that she was wrongfully terminated for a variety of reasons. In order to understand this claim, the Arbitrator looks as the different projects she worked on during that period of employment, as all play a role in her second "wrongful termination" claim.

a.    **The A-Pillar Lit Sill**: The original Model S was launched in the United States. Tesla later decided to introduce a European model, which required the car to be reconfigured to accommodate right hand drive. This required the redesign of the A-Pillar, which is the upright metal post dividing the front and back of the car. A "sill" ran from the bottom of the pillar on the left to the front of the car on the right. In keeping with then-current trends, the word "Tesla" on the bottom of the sill would be lit from the bottom up so that the name popped

out when the driver opened the door of the car.  This project fell to the Interiors team, and Balan was assigned to prepare details for the new, A-Pillar Lit Sill.

The project started like any other.  Balan used CATIA to come up with specifications for the part, and those were sent to suppliers, who responded with bids to produce it.  The final decision regarding which supplier's bid to accept would be made by Tesla's Sourcing Council, an independent group made up of members of the Vehicle Engineering, Supply Chain, Supplier Quality, and Financing teams (Tx., 900:20 – 902:24).  Balan was not a member of the Sourcing Council.

Among the bidders for the A-Sill were Angell-Demmel ("A&D") and Tasus.  A&D was currently the supplier of the A-Sill for Tesla's left-hand drive cars.  Tasus had not previously earned a production contract from Tesla; if Tasus were successful, this would be its first such project.  Although no Tasus personnel testified at the hearing, from the evidence it was apparent that Tasus was most anxious to win this contract.

Once the specifications are sent to potential suppliers, those suppliers will typically engage in an interactive process with the part designer to agree upon various "concessions" so that the part could be producible on a commercial scale (Tx., 812:8 – 813:8).[47]  Both A&D and Tasus engaged in this process, but Balan clearly favored Tasus, who exchanged 100 emails with her.[48]  A&D, on the other hand, sent Balan fewer than ten (Tx., 813:6-8), the essence of which was, in Balan's view: "we can do it like this or we don't do it at all" (*Ibid.*).  Tasus was in active communication with Balan about what they could do to get the contract, and how they could do it.  From Balan's testimony, Tasus respected Balan, responded to her emails promptly, and otherwise paid a great deal of attention to her.  This fit Balan's expectations quite well, particularly when compared with the incommunicative A&D (*see*, "Credibility").

---

[47]     The testimony was clear that there were material differences between a prototype and a mass-produced product.  While a prototype may be more refined and, on its own, look very attractive, some of the "fine edging" might get lost when the part was placed into mass production.  From Tesla's point of view, no matter how attractive the prototype, if it couldn't be effectively mass produced, it was no good.

[48]     A third company, Mayco, was also a potential supplier.  It is not clear from the testimony whether both Tasus and Mayco sent "more than a hundred emails" to Balan, or if Tasus did so alone.  The point is that Tasus was very engaged with Balan, while A&D was not.

When the bids for the right-hand A-Sill were opened, Tasus had the lowest bid by far.[49] Tesla's Purchasing Manager, Ted Gawronski, was concerned that this bid was artificially low, which almost surely meant that there would be problems down the road. He was troubled, among other things, by Tasus's lack of prior manufacturing experience, apprehensions he passed on to the Sourcing Council. In due course (for reasons not in the record), the Council chose A&D to supply the A-Pillar lit sill for the right hand drive.[50]

Ultimately, working closely with Balan (who was apparently working with Tasus behind the scenes and unbeknownst to her supervisors), Tasus produced a prototype of the sill part that was very close to Balan's design. Balan loved it, and promptly urged Gawronski, her boss on the sill project, to switch from A&D, saying that she backed Tasus "200%" (Tx., 1837:2 – 1838:6). Gawronski said that a switch like that was not as easy as Balan might think and instructed her to keep working with A&D for the part. Balan responded by announcing: "If you guys decide to go with A&D, please consider I'm not part of the project anymore…. I do not want to have any engineering involvement or responsibility in this project from now on" (Exh. 117).

Although Balan publicly flounced away from the sill project because she wasn't getting her way, secretly she kept working on it, referring to her work with Tasus as a "back up plan" (Exhs. 121, 664). Balan took the Tasus prototype to Nancy Holman, a worker in the Studio team (a different team altogether) and urged Holman to show the Tasus prototype to her own superiors. Balan apparently believed that she could wangle the ouster of A&D and replace them with Tasus. Balan's managers did not know she was engaging in this conduct (Tx., 904:2-12; 1060:7 – 1061:10; 1390:25 – 1391:3; 1749:23 – 1750:3; 1809:3-14) (see, "Credibility").

---

[49]     A&D's bid was $244,000, while Tasus's was only $14,000 (Tx., 814:2-4).

[50]     Balan argues that Raczkowski had improperly manipulated the date the Sourcing Council would meet to choose the supplier for the A-Sill because he was receiving kick-backs from A&D (Tx., 819:20 – 820:4). This appears to have been nothing more than pure speculation or conjecture on Balan's part: "I really believed that – I really believed that the – they committed fraud…or some kind of kickback or something" (Tx., 819:24 – 820:4). Balan never provided any more concrete testimony to support her "fraud and cover-up" claims.

Balan's activities on behalf of Tasus somehow bore fruit.[51]  For reasons not entirely clear from the record, Tesla agreed to look at the Tasus factory in China to see if the factory met Tesla's specifications for production.[52]  When this inspection process was finished, however, so was Tasus.  Its production factories fell far below Tesla's standards for outsourced manufacturing facilities.  Because the sourcing project had been interrupted, however, the bidding process for the A-Pillar sill started anew.  A&D was selected a second time – again by the independent Sourcing Council – but Tesla had lost substantial time getting the sill project underway because Balan had been spending unauthorized time working on her Tasus angle.

      **b.**    **The Headliner:**  Balan also got involved in the so-called "headliner project."  The headliner was designed, at least in part by or under the supervision of, her supervisor Raczkowski, a man for whom Balan did not attempt to conceal her contempt.  Apparently when the headliner (the roof inside the car) was designed, the dimensions were such that the edge of the headliner did not meet the roof of the car, resulting in a small gap, known around Tesla as the "rathole."  This became apparent when the supplier of the headliner, Magna, sent in the first prototypes for testing.  Unfortunately, due to an internal communications garble (Tx., 1439:21 – 1439:19), Magna was under the impression that the prototype was OK, so it made a production delivery of 600 headliners the following week, none of which, obviously, fit.  There was a minor attempt to fill the rathole with foam, but that promptly proved unworkable (Tx., 1421:1-15).  Raczkowski and others, primarily Moises Ruiz, the engineer responsible for the headliner design, decided to junk the 600 headliners and correct the problem the right way (Tx., 1428:1-15; 1438:7-20).

      The unusable headliners were carted to a side of the Tesla yard next to the garbage cans, where they lay in plain sight until the garbage trucks carted them off.  Somehow Balan learned of this situation, however (exactly what she "knew" and what she simply concluded was never clarified on the record) and decided that Raczkowski was intentionally attempting to cover up a

---

[51]     The Arbitrator remains perplexed about how Balan was able to spend so much time on non-assigned projects, and to do so under her supervisors' very noses.  As noted above, however, this is a management issue and not the subject of this arbitration.

[52]     It developed that Tasus didn't have its own factory; it outsourced the work to others.

FINAL AWARD-CORRECTED

design error.  Moreover, by putting cars on the road with foam stuffed in the rathole, Balan determined that Raczkowski was creating a customer safety problem.  Balan reported the matter to senior management, claiming that Raczkowski and others were "conspiring" to hide the problem.  She even took a photograph of the headliners piled next to the garbage cans, that she insisted was proof of Raczkowski's surreptitious efforts to "cover up" his design error (see, Exh. 217).  An investigation of sorts was launched into the issue.

It developed that Tesla's management knew all about the rathole problem; it was no secret (Tx., 1070:7-18; 1072:3 – 1073:21; 1433:24 – 1435:12).  Moreover, with 600 headliners sitting out in the open next to the garbage cars, it was an issue that was impossible to cover up (Tx., 1435:13-19; 1758:2-23; 1938:23 – 1940:11).  There was no evidence introduced that any automobile ever left the Tesla factory with the rathole in it, whether stuffed with foam or not.  It appears to the Arbitrator that the rathole-conspiracy imbroglio – as opposed to the admittedly wrongfully designed headliner part – was mischaracterized by Balan in this arbitration for unproven but inherently inferential reasons.

While Balan's claims of conspiracy and cover-up found no basis in fact, they did create a great hubbub and consume a lot of time.  Rather than spending her time on assigned projects, Balan focused on bringing Raczkowski and Allen to "justice" for their alleged fraudulent activities and, in Balan's words, forcing her to "lie" to cover up for them (see, e.g., Exh. 217).[53]

The point of the foregoing for purposes of this arbitration is not that there was a headliner problem – there was – but rather that Balan's focus was first, on turning the problem into a coverup conspiracy[54] and, more importantly, by devoting her time to it, time that should

---

[53]     She also believed, although the source of her "information" was never adequately clarified, that Raczkowski and his superior, Allen, had some kind of ownership interest in the selected sill supplier, A&D, or would get a financial kickback from A&D if they won the contract.

[54]     "A.     And I start asking question.  I want to ask [Raczkowski] what's going on with the project.  How come a headliner that I was working on end up, you know, being defective when we had not even released the part?

"Q.     What did he say?

"A.     And he got really anxious, and he started yelling at me.  He said, 'It's not your damn business.' … And 'Stop inquiring about this'" (Tx., 801:18 -802:4) (see, also, Tx., 807:1-14: "[Raczkowski] threaten me.  'I told you not to get involved in this.  It's not your job.  It's not your responsibility.  You should be careful how many questions you ask from now on.'"

otherwise have been devoted to assigned projects (*see,* "Credibility"). This misallocation of time created inefficiencies for Tesla, as Balan necessarily detoured from her assigned work to her personally selected efforts. The time Balan misspent on the Headliner project, paled in comparison to Balan's surreptitious work on her next project, the Sunvisor.

      c.    **The Sunvisor:** Another of Balan's assignments with the Interior team was to design the sunvisor for the ceiling of the car. This was to be a physical sunvisor that the driver (or passenger) would pull down from the stationery spot where it was affixed to the roof of the car, and then manually adjust to block the sun from interfering with the person's vision. Somewhere along the line, Balan learned of an electrochromic technology that allowed glass to darken when physically touched. This captured Balan's attention as a very sexy alternative to a manual sunvisor, and she reported it to her supervisor, Derek Allen. Allen was also excited by the technology and directed Balan to talk with Tesla's in-house patent attorney (Exh. 595). That attorney put a blanket on Balan's hopes, however; he said that the idea was not patentable (Exh. 443) and, anyway, the technology had not yet advanced to a point where it could be effectively implemented into Tesla's vehicles. Balan was told to drop the electrochromic idea and instead to develop the physical sunvisor she had originally been assigned (Exh. 598).

Balan (without telling her supervisors) refused. Convinced that her electrochromic sunvisor was a brilliant idea, she began researching it on her own (*see,* "Credibility"). She located a firm in New York, Smart Glass, that she thought could provide the technology. She told Allen that wanted to go back east to visit Smart Glass, but when Allen learned that they were only a licensee of the technology, not a manufacturer that could actually provide cost and timing information, he refused to approve the trip. Not to be thwarted, Balan approached a friend in the purchasing department, Chelsea Ramm, and asked her to get plane tickets to New York for her. This violated company policy on several levels (Exh. 101; Tx., 885:3-8; 886:11-19; 1405:13 – 1406:15) (*see,* "Credibility"). The trip to New York never took place.

When Balan's supervisors discovered her conduct, she was reprimanded. She acknowledged her insubordination and promised to work on the physical sunvisor to which she

had been originally assigned (Exh. 104; 1761:9 – 1762:21).[55]  Rather than follow directions, however, and remaining enchanted by her electrochromic Muse, Balan secretly went to Tesla's Glass Department and pitched her idea to Matthew Gruss (Tx., 1813:16 – 1814:9; 1821:1-3) (*see*, "Credibility").  Gruss assumed that Balan was approaching him with her supervisors' approval, so he submitted a purchase order to Smart Glass for a prototype (Exh. 111; Tx., 1814:21 – 1815:24; 1826:6 – 1827:20; 1945:20 – 1946:3).  When the prototype arrived, Balan was somehow able to get it installed on a Model S as part of a secret project that nobody knew about.[56]

All of this work on the electrochromic sunvisor (coupled with her behind-the-scenes work with Tasus) combined adversely to affect Balan's ability to complete her regular assignments.  She started missing deadlines and deliverables.  Coupled with her disdain for her direct supervisor, Raczkowski, it was obvious to Allen that Balan had been wrongly placed in the Interiors team.  Allen therefore transferred her to a different supervisor, Jared Nussey, who was responsible for the Interior Panel group.  Allen hoped that this change of assignment would reinvigorate Balan and improve her performance.  However, because Balan was still diverting her time behind-the-scenes to her electrochromic project – and possibly other projects – Balan's work in her new assignment was below par.  Nussey therefore gave her a negative six-week performance review.  Of particular importance is Nussey's description of Balan's work ethic:

> "In the 6 weeks we've worked together, I have noticed many behaviours (sic) I would like to address.  For instance, I've mentioned repeatedly core hours are 9am to 6pm, and I would appreciate it if you took lunch from 12-1.  I understand that *sometimes* life happens, which means *sometimes* you have to run out later, or the day starts later, but the trend I see is someone who consistently comes in late.

> "Another behavior I would like to address is the social aspect.  I have intentionally assigned you the type of work to keep you at your desk, to more easily monitor your

---

[55]      "I just wanted to send this email so it will be official that I am stepping out of this [electrochromic] project today as requested a while ago.... I know what I did for the past almost two months was Insubordination and Even it is to late I do apologize again for not stopping when you first ask me to" (grammar in original) (Exh. 104).

[56]      The Arbitrator reiterates his confusion about how Balan could get so far as to have her electrochromic glass installed on a demonstration Model S without her supervisors knowing anything about it.  As before, however, this points more to inefficiencies within Tesla management than to misconduct by Balan.

distractions. You should have no distractions, the work I've given you is almost entirely computer related. I do see that you seem to spend an excessive amount of time up and around talking to people around the office, who aren't working with the parts you're on, so I can only conclude that you're not working. The same applies to your email, and phone calls. Not work related. I would like to mention I'm not trying to force you into isolation, but you have parts that are weeks and months late. For example, the MCU bezel update, we didn't have the complete in time to show the supplier who visited last week. Work first play later.

"I don't know how else to say this, but these distractions together with your poor attendance do not give me the impression that you are a committed team member. Please look to your other teammates for inspiration. If you have questions please ask. If there's something you don't understand please ask. I'm here for my team, and like it or not, you're on my team" (emphases in original) (Exh. 231; *see, also,* Tx., 1691:25 – 1692:21).

Nussey testified that he prepared this Corrective Action Document (Exh. 231) because his oral efforts to get Balan to pay attention to her assigned tasks had been ineffective:

"Q.    Why did you prepare it?

"A.    The conversations weren't effective in trying to correct the activities that I saw, so I felt I needed to formalize it.
                         * * * * *
"Q.    What were your observations about Ms. Balan's performance?

"A.    The document here highlights the coming and going time, the long lunches. It also highlights the lack of making deadlines, as well as the social aspects of talking to everybody as they walked by and not getting stuff done. Basically not doing the work" (Tx., 1692:4 – 21)

Balan characterizes Nussey's Corrective Action as a demotion and as part of a "conspiracy" to get rid of her. Even though Balan had been moved to Nussey's group, she continued her campaign against Raczkowski. She complained about him to Chris Porritt, Tesla's Vice President of Engineering. She even got a group of co-workers to meet with Porritt on a Saturday morning so that all could air their concerns about problems at Tesla, particularly Raczkowski's leadership. At this meeting, which was touted to all as being confidential, Balan secretly tape-recorded what all of her co-workers said about their work at Tesla.

After the Saturday group meeting, Balan again met with Porritt to complain about Raczkowski. During this meeting, she unexpectedly told him that she was dying (Tx., 1194:24 –

1196:12).  This caught Porritt by surprise, so he promptly called Marissa Peretz from HR to
address possible reasonable accommodations under the ADA (Tx., 1195:14-23).  It developed
that other employees had also reported to Peretz that Balan was claiming that "she was dying and
that she was on her deathbed" (Tx. 1231:22-1232:7; 1234:15-20).  Peretz scheduled a meeting
with Balan to discuss potential reasonable accommodations (Tx., 1233:8-25).  At that meeting,
Balan told Peretz that she had suffered a heart attack during her previous employment with Tesla
(the "heart attack" was demonstrably untrue, and Balan knew it), and that "she could die at any
moment and there was nothing that [Tesla] could do" (Tx., 1235:13 – 1236:10).  Balan conceded
that she had told that to other employees and testified that she told Peretz that the "only thing
[Tesla] could do for [her] is call 911" (Tx., 1612:22 – 1613:5).

Balan was not interested in discussing reasonable accommodations.  Rather, she reported
to Peretz that: "Right now I think you have a very big problem to solve in the team and that after
me is more important" (Exh. 199).  That problem was Andrew Raczkowski and Derek Allen.
Peretz responded by reporting Balan's claims to Tesla's Associate General Counsel, Steven
Cooper (Tx., 1239:3-16).  When Cooper wrote that he wanted to talk to Balan (Exh.721), she
immediately wrote to Porritt: "Chris, I need your help!" (*Ibid.*).  Porritt promptly wrote back:
"Christina [sic] – I did ask [Cooper] to talk to you.  Please just be honest and open.  This
discussion is about your concerns" (*Ibid.*).

Cooper contacted Balan the next day to initiate an investigation into her claims (Exh.
514).  Balan responded by sending Cooper a 10-page, single-spaced email (5 of the pages were
photos of the headliners piled in the trash area) setting forth her multiple concerns (Exh. 217).
Balan accused Allen and Raczkowski of lying, of trying to force her to lie, of threatening her, of
trying to shut her down from going to senior management with concerns, of covering up
problems, and a variety of other topics (*Id.*; Tx, 1745:1 – 1746:6).

Cooper, who didn't testify at the hearing but was inferentially suspicious given the
frenetic nature of Balan's allegations, asked her to be more specific, as well as to provide him
with whatever evidence she had to support her claims so that he could conduct a complete
investigation (*Id.*; Tx., 1737:17 – 1738:7).  Specifically, Cooper told Balan:

"I am not investigating whether you agree or disagree with Derek's [Allen] or Andrew's [Raczkowski] decisions.  I am not investigating whether they made good decisions.  I am investigating whether they made bad decisions and then engaged in fraud against the company by covering it up.  That is a very different issue than whether Derek supported Andrew's decision and not yours....

"If we conclude that someone committed fraud against the company, not only would we terminate that person's employment, but we would also seek criminal and/or civil penalties against the person.  On the flip side, if we conclude that someone accused a manager or others of fraud against the company and we concluded that the accusation was not made in good faith or that the person who made the allegation had an ulterior motive, that person would be subject to discipline" (Exh. 225).

Balan did not provide Cooper with the information he requested.  At the Hearing, she described the foregoing email from Cooper as being a "warning" for her to drop all her complaints and not to open an investigation (Tx., 1134:2 – 18).  The Arbitrator finds this interpretation unsupported by the evidence.  It appears to the Arbitrator that Balan's true concern in launching this investigation was more along the lines of proving that she was "right" and getting even with her supervisory nemeses.

Shortly after Cooper started his investigation, Balan asked him when it would be complete (Exh. 725).  Cooper replied that his investigation could take weeks because of the potential number of witnesses and documents (Exh. 218).  Balan then reported to Porritt that she was so distraught by the entire situation at Tesla that "I cannot, I JUST cannot stay several weeks or months for [Cooper] to finish his investigation..." (emphasis in original) (*Ibid.*)  She told Porritt that she intended to resign on Monday (*Ibid.*).  Balan also started telling other Tesla employees that she was going to resign her employment (Exh. 730; Tx., 1908:14-1909:7; 1915:12 – 1916:18).

On Monday, April 14, 2014, Balan carried out her threat and sent her written resignation to Eric Bach, the Director of Engineering (Exh 230).  There ensued a great kerfuffle with Balan testifying that Bach told her that, if Balan promised Bach that she wouldn't take her complaints about Tesla to Elon Musk, he (Bach) would move her to work under another manager (Tx.,

1138:15:21).[57]  Ultimately, two days later, on April 16, 2014, Tesla formally accepted Balan's resignation.  This led to Balan's formal exit interview, a circumstance that prompted a testimonial description of one of the more bizarre events in this arbitration.

Balan testified that on April 14th, 2014 she was on her way to see Elon Musk to disclose to him the rancid state of affairs inside Tesla.  On her way, she was unexpectedly intercepted by Bach and Peretz (HR), who took her to a small room for what became her exit interview from Tesla.  Balan's description of these circumstances was bewildering.

Balan testified that Bach and Peretz took her to a place in the "lower unit" of the Tesla factory that she had never been to before (Tx., 1141:8-17).   She likened it to a "dungeon" (Exh. 259; Tx., 326:2-11; 1146:3-5).[58]  Balan testified that there were all these hanging sheets of plastic that she had to push out of her way as she walked (*Ibid.*).[59]  She testified that "out of the blue, they open a door" to reveal a small room with two security officers present, one inside and one outside the room (Tx., 1141:19 – 1142:5).  Peretz told both guards to wait outside (Tx., 142:7-16).  Balan testified that once inside, Peretz told her that Tesla "was glad" to accept her resignation (Tx., 1142:18-21).  Balan then testified that Peretz presented her with resignation paperwork and told Balan that if she did not sign, she would forcefully be taken out of the room in handcuffs by the nearby security personnel (Exh. 259; Tx., 326:2-11; 1145:22 – 1146:6).  Balan testified that she refused to sign the documents presented to her, as they represented that she was leaving Tesla voluntarily (Tx., 1142:2-11), while Balan maintained that she was being terminated because she dared to speak out against Raczkowski and Allen.  Balan insisted that she

---

[57]     Balan described this as the "German Handshake," a phrase that means that you keep your promise (Tx., 1139:4-17).  The idea of a "German Handshake" seems to have popped up for the first time during the arbitration testimony, however (Tx., 1922:19 – 1923:3).

[58]     Balan sought the services of two medical professionals, Dr. Gary Weil and Dr. Neil Siecke, to support her claim that the exit interview caused her significant physical and psychological harm.  The stories she told these experts varied materially, not only from each other but also from her testimony during discovery in this matter.  The facts recited above collate some of the more flamboyant – and contradictory – descriptions from these three sources.

[59]     Photographs of the area where Balan had her exit interview were introduced at the hearing (Exh. 284).  They were pictures of the first floor of the Tesla building.  The room where her exit interview took place was clearly visible and was a small office right next to the main glass doors that were the entrance to the building.  True, there was some construction work going on and there was some plastic blocking off that work, but it did not darken the area or create an obstacle course for a person walking around down there.

would not sign the separation documents unless they reflected her position, so Peretz wrote: "threatened if she spoke up" on the Exit Interview Questionnaire (Exh. 238; Tx. 1143:12-22; 1246:13-20; 1247:18-25).   Balan then took the pen and wrote next to Peretz's entry: "I [resign] from the position that I was put in a month ago because I dare to speak up to the sr. management. Also because [people] that had the chance to speak up were threat. on 1x1 conversation" (Exh. 238; Tx., 1143:23 – 1144:7; 1144:16 – 1145:21; 1246;13-19; 1247:18-25).

Once the paperwork was signed, Bach and Peretz escorted Balan from the room.   Balan testified that she was "really scared.   I didn't know if they will still handcuff me" (Tx., 1146-20-22).[60]   Balan said that Peretz then "snatched" her employee badge away from her, stating: "You really didn't believe that we will let you see Elon, right?" (Tx., 1147:3-9).   A short while later, Cooper showed up to give her some personal items from her desk.   She testified that Cooper threatened her and said: "if you care about your family and your well-being, you should – you should delete the recordings that you have and, hopefully, you will never show it to Elon" (*Ibid.* at 18-24).   Balan testified that she was then taken outside, where she fainted and woke up in an ambulance hooked up to oxygen and IV fluids.   She testified that she was covered in her own vomit (Tx., 1149:9-16).   Balan cites this incident in the "downstairs dungeon room" as the catalyst for the damages she seeks due to her Post Traumatic Stress Disorder and Broken Heart Syndrome.

13.   **Balan Voluntarily Resigned Twice from Her Employment at Tesla**:   Balan seeks damages because, she alleges, she was involuntarily terminated twice from her two separate employments at Tesla.   These terminations were, variously, because she was ill (cancer), because she asked to be reclassified as a non-exempt employee, because she reported to management that other employees (Raczkowski and Allen) were committing fraud and trying to cover it up and similar reasons.   The evidence does not support any of her theories.

a.   **The Maneuvers Involved in Balan's Numerous Resignations**:   The evidence established that Balan resigned her employment (or threatened to resign) some half

---

[60]   In her interview with Dr. Siecke, she told him: "…[Peretz] told me that if [I] didn't sign the paper right away, there would be some harm to [me]." Dr. Siecke continued: "She then went on to say that she felt like they may even kill her…. That is what she reported to me" (Tx., 570:11 – 573:20).

dozen times doing her two periods of work at Tesla. Many times, particularly in connection with her first hire, the resignations resulted in attractive employment benefits for her.[61]  The evidence compellingly demonstrated to the Arbitrator that Balan often used pity, misfortune and emotional self-flagellation as bases to gain employment advantages. She constantly saw herself as either a savior or a victim, hated by the company precisely because she was one of the few who stood up for goodness and honesty in it. She found spies and conspiracies against her everywhere she looked. Many of the details have been stated above, but the record is replete with additional examples. Balan's emails to co-workers are filled with references of self-sacrifice, conspiracies against her, and how she was being punished for trying to do what's right. Her parting email to colleague Bill Heley on April 14, 2014, her last day at Tesla, is illustrative:

> "It seams [sic] that [Raczkowski] and [Allen] were right when they told me they are making the rules in here…
>
> * * * * *
>
> "That's why both, [Raczkowski] and [Allen], of them were smiling at me today. The amount of things I've heard this week from my team that they've heard both of them talk about me is shocking.
>
> "I know what they are trying to do not … I am So So Sorry I believe in this company…
>
> "The associate general counsel [Cooper] repay [sic] to me that they have to interview [Raczkowski], [Allen] and Eric [presumably Bach but possibly Geiduschek] and others and that will take several weeks not knowing the timing on it….I, I am the one cannot do that I think I didn't think how much my heart can take.
>
> * * * * *
>
> "What I'm sorry the most is the fact I put all the team mates that went to similar problems with them to speak up and not be afraid and look on them now… They are more afraid

---

[61]     The Arbitrator has considered the possibility that, had Tesla properly categorized Balan as non-exempt in the first instance, the financial problems of which she complained would not have existed. As appropriate as this approach may seem, the Arbitrator finds it defeated by the record. For example, while Balan told her supervisors that she needed to support her parents, when push came to shove it turned out that her parents could provide the needed financial sustenance themselves. When this issue was pushed at the Hearing, it developed that Balan had promised her parents that she would support them financially, at least until they came to America. When she could not, it wasn't as much a question of money as it was Balan breaking a promise to her mother and father. (While not so identified in the record, the Arbitrator observed Balan weeping when she testified that she hadn't kept a promise she had made to her parents. Balan's motive vis-à-vis her family is commendable, but in the context of her employment at Tesla, it became the vehicle to personal financial benefit.)

than ever.  They were called in a separate room on 1x1 meeting with [Allen] intimidated and scare them and even tell them that they have a problem not [Raczkowski]…Force them in the meeting to agree in working with [Raczkowski].

"We are afraid to talk and consult each other in job related things so they will not see us talking.

"Thank you so much for everything.  I was so happy to work with you and I'm so grateful to help me with the project.  Even if something happens to me I'll never regret speaking up or fighting for someone … I'm just Heartbroken to realize what Tesla is…

"I'll Leave Tesla so they will leave the other that did speak alone … stupid me for trying.

"They were right about one thing … Doing the right thing is not always right to do …

"I Loved Tesla much ... so much got nothing… I wish I had the courage to tell Elon about all this …

"Even if our project doesn't go thru the fact you help me up to the end it means a lot to me!  That I'm the end the cause why they hate me so much.

"Goodbye Rich and Thank you from all my silly big heart" (grammar and spelling in original) (Exh 730).

14.     **Balan Has Failed to Establish Any of her Other Theories of Liability**.  Balan seeks millions of dollars in damages based on her theories that she was twice wrongfully discharged, resulting not only in the loss of past and present income, but also in emotional and physical/psychological damages.  Balan has not carried her burden of proof regarding any of these theories.  While the Arbitrator acknowledges a lack of linear consistency in the facts surrounding Balan's two terminations, he notes that many different people were involved in both of them, and Balan could often be seen playing various members of the Tesla work force off of each other.  Ultimately, however, this is of minimal legal significance.  Balan was an at-will employee, and Tesla was free to terminate her employment for any reason, or even for no reason. What Tesla could not do, however, was terminate for a reason prohibited by law.  Balan seeks to take advantage of this maxim by describing her terminations precisely in terms that the law does not permit:  discrimination, retaliation, blowing the whistle on internal fraud or corruption, medical conditions, etc.  Balan, with great skill and legal acumen, marshals bits of evidence that,

under appropriate circumstances and in a proper context, might support her legal theories.  The Arbitrator, however, finds as a matter of law and fact that the record as a whole does not support her position on any of them.  Balan was correct regarding her improper classification as an exempt employee (although her claim for damages was materially manipulated and overstated), but she failed to establish any other theory of liability she asserts against Tesla.  Specifically, the Arbitrator finds:

> **1.**     Balan did not establish that she was terminated from her first period of employment because she complained about being misclassified as an exempt worker;

> **2.**     Balan did not establish that she was terminated from her first period of employment because she suffered from an actual or perceived heart or other medical condition;

> **3.**     Balan did not establish that she was terminated from her second period of employment because she blew the whistle or otherwise attempted to report fraud, cover-up, or other violation of the law (Cal. Labor Code §§ 1102.5, *et. seq.*);

> **4.**     Balan did not establish that she was terminated from her second period of employment because Tesla discriminated against her on account of her sex, or on any other wrongful basis;

> **5.**     Balan did not establish that Tesla failed to prevent illegal or wrongful discrimination or retaliation;

> **6.**     Balan did not establish that she was constructively terminated from Tesla for any reason;

> **7.**     Balan did not establish that she suffered any damages, other that the lost wages that the Arbitrator awards her in this Final Award, by virtue of any illegal or wrongful actions at Tesla during either her first or second period of employment.

15.     **Balan's Claims for Damages (Other than Present Wage Related Claims)**

a.     **Balan's Claims Damages Based on Lost Past and Future Wages**.

Balan asserts that she is entitled to hundreds of thousands (if not millions) of dollars in past and future wages, arguing that, had Tesla not wrongfully terminated her twice, she would have remained gainfully employed by the company.   As with all of Balan's non-salary related damages claims, the key here is causation.  The Arbitrator finds that Balan failed to establish that she was wrongfully terminated following either her first or her second period of employment with Tesla.  In the absence of causation, the responsibility for claimed lost past and future wage loss does not flow.  This applies equally to her claim that, but for Tesla's wrongful termination of her employment, she would have enjoyed the benefits of her stock option grants.  Balan will receive nothing on her claims for damages based on lost past and future wages, and loss of stock options values.

b.     **Balan's Claim for Damages Based on Physical Injury**.  Both Balan and Tesla put on substantial evidence tending to prove (or disprove) that she did or did not suffer the debilitating effects of PTSD and/or Broken Heart Syndrome (Takotsubo Cardiomyopathy).  Their respective medical experts dueled over whether Balan suffered from either of these conditions, both of which were assertedly brought about by her traumatic exit interview in the dungeon following her second employment at Tesla.

The Arbitrator finds that Balan's description of the exit interview was hyperbolic, exaggerated, and unsupported by the evidence.  As with her other claims for non-wage related damages, the evidence fell far short of establishing the underlying causation requirement, e.g., that anything Tesla did or did not do during the exit interview caused Balan whatever physical manifestations appeared following her resignation, regardless of whether she does or does not in fact suffer from either of these maladies (or any other).[62]  Balan will receive nothing on her claims for damages based on her claim that Tesla caused her to suffer physical injury.

c.     **Balan's Claim for Punitive Damages**.  Balan seeks punitive damages in the sum of $100,000 because of Tesla's wrongful conduct.  The Arbitrator finds that Balan has failed to prove the elements needed to establish such a claim.  Balan will receive nothing on her claim for punitive damages

---

[62]     This is so regardless of whether her separation is termed a voluntary resignation or a decision by Tesla to terminate her employment for legitimate business reasons.

FINAL AWARD-CORRECTED

16.    **Tesla's Request that Balan be Required to Pay for the Postponed Hearing.**
As noted at the beginning of this Award, the arbitration Hearing in this matter was continued
from its originally scheduled date to the end of 2017 to allow the parties time to conduct
discovery on Balan's newly expanded theories of physical damage, *e.g.*, PTSD and Broken Heart
Syndrome.  Although the Arbitrator has denied Balan any recovery on those theories, he does not
find that they were advanced without a genuine belief in their efficacy to the facts in this case.
The Arbitrator does not find the assertion of more sophisticated damage theories, while it
occurred late in the proceedings, was done in bad faith or for any other untoward reason.  Tesla's
request that it be reimbursed for the continued arbitration fees is Denied.

17.    **Attorneys' Fees and Costs.**  As noted at the outset of this Award, the Arbitrator
determined that Balan was entitled to recover her reasonable attorneys' fees and costs spent on
her successful misclassification claim.  She is not entitled to recover fees or costs spent in
connection with her prosecution of any other theory.  The Arbitrator further ordered that Tesla
was not entitled to recover its fees and costs on any claim in which it prevailed, although the
Arbitrator recognized that this position might be affected by the CCP § 998 Offers to
Compromise that were filed in this action.  Before getting to the actual "fees and costs"
disposition, therefore, the Arbitrator looks at the Section 998 history.

18.    **Both Tesla and Balan file Offers to Compromise under CCP § 998.**  Both
parties filed CCP § 998 Offers to Compromise.[63]  Specifically, on June 9, 2017, Tesla offered
Balan $430,000 pursuant to CCP § 998, "which sum includes as a component, Claimant's costs
and fees heretofore accrued, in exchange for a final dismissal of this entire action by Claimant"
(*see,* Decl. of Yosef Peretz, Ex. 14).  Tesla's offer was inclusive of "all costs of suit and
attorneys' fees potentially recoverable in this action" by Balan.  Paragraph 4 of the offer also
stated:

> Claimant is advised that if the Offer is not accepted and Claimant
> fails to obtain a more favorable judgment, Claimant shall be
> subject to certain statutory penalties, both mandatory and
> discretionary, including without limitation the inability to collect

---

[63]    Several earlier Offers were filed, but they expired long before the Hearing and no longer have any legal
effect.  The Arbitrator looks only to the *last* CCP § 998 offer filed by each party.

> attorneys' fees and costs from Respondent, as well as liability to
> Respondent for its attorneys' fees and costs incurred after making
> this Offer. In addition, pursuant to *Holman v. Altana Pharma US,
> Inc.*, 186 Cal. App. 4th 262, 283-84 (2010), Claimant must
> reimburse Respondent for all post offer costs if she does not obtain
> a judgment more favorable than this Offer (*Id.*, ¶4).

Balan never accepted this offer, and it expired on July 9, 2017 (*see, Id.*).

On August 2, 2017, Balan served her own CCP § 998 offer on Tesla in the amount of
$600,000. This offer was inclusive of "all costs of suit and attorneys' fees potentially
recoverable in this action by Balan." Tesla never responded to this offer; thus, it, too, is deemed
rejected (*see,* Decl. of Yosef Peretz, Ex. 15).

Tesla now contends that, pursuant to its own, unaccepted § 998 offer, Balan must pay all
of its costs from the time of its offer, plus she must pay "a reasonable sum to cover" Tesla's
reasonably necessary post-offer expert witness. Balan maintains that CCP § 998 does not apply
to this arbitration because both FEHA and Labor Code §§ 218.5 and 1194 are one-way fee
shifting statutes that do not permit a prevailing employer to recover costs and attorneys' fees.
Relying on *Scott Co. of California v. Blount, Inc.* (1999) 20 Cal.4th 1103, *Mangano v. Verity, Inc.*
(2008) 167 Cal.App.4th 944, and *Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2018) 19
Cal.App.5th 525, Balan explains that, even when a CCP § 998 offer is made and the employer
prevails or the plaintiff fails to beat the CCP § 998 offer, the employer still may not recover its
costs and fees.

The Arbitrator finds that section 998 applies to these proceedings, and that Balan is
correct that Tesla is not entitled to recover its post-offer costs or its post-offer expert witness
costs under this code provision.

California Code of Civil Procedure section 998(c)(1) states, in relevant part:

> 3(c)(1) If an offer made by a defendant is not accepted and the
> plaintiff fails to obtain a more favorable judgment or award, the
> plaintiff shall not recover his or her postoffer costs and shall pay
> the defendant's costs from the time of the offer. In addition, in any
> action or proceeding other than an eminent domain action, the
> court or arbitrator, in its discretion, may require the plaintiff to pay
> a reasonable sum to cover postoffer costs of the services of expert
> witnesses, who are not regular employees of any party, actually

incurred and reasonably necessary in either, or both, preparation
for trial or arbitration, or during trial or arbitration, of the case by
the defendant (Cal.Civ.Proc. §998(c)(1)).

Section 998 continues:

(2)(A) In determining whether the plaintiff obtains a more
favorable judgment, the court or arbitrator shall exclude the
postoffer costs (Cal.Civ.Proc. §998(c)(2)(A)).

Balan contends that she obtained a "more favorable judgment or award" than Tesla's
operative CCP § 998 offer of $430,000, which was made on June 9, 2017 and expired on July 9,
2017. Tesla avers that Balan's position is without merit because it is based on fees incurred prior
to June 9, 2017 in connection with *all* of her claims, when only fees associated with her wage
and hour claims may be considered.

On June 9, 2017, Tesla offered Balan $430,000. On May 21, 2018, she was awarded
$122,343.25 for her wage and hour claims only; she received no other recovery. With interest –
and accepting for purposes of this analysis only that Balan's interest calculation is correct (it is
not; *see*, pp. 60-61, *infra*) – her total damages recovery is at best $221,292.91.[64] In order for
Tesla's § 998 offer of $430,000 to "beat" Balan's recovery, *e.g.*, Balan must have "fail[ed] to
obtain a more favorable judgment or award," Tesla would need to prove that Balan incurred less
than about $208,000 in fees and costs prior to June 9, 2017 ($221,292 in damages plus $208,000
in fees/costs = an award of $429,292).

Tesla has failed to make this showing. Balan has documented that she incurred nearly
$500,000 in *potentially* recoverable attorneys' fees and costs by July 9, 2017,[65] the date on which
Tesla's § 998 offer was set to expire (*see*, Peretz Decl. Exh. 18). She calculates a damages
award, including (incorrect) interest, of $221,292.91, on her prevailing misclassification claims.
This well exceeds $429,292.91, which is about the maximum recovery that could have been "a

---

[64]     The Arbitrator does not accept Balan's belated claim of $20,426.57 in waiting time penalties (*see*, p. 1, fn.
1), and has subtracted that from the claimed total.

[65]     The Peretz Declaration refers to "Cumulative Fees and Costs" incurred as of *July* 9, 2017. Tesla's § 998
offer referred to "costs and fees *heretofore* accrued" as of June 9, 2017. The difference, while favoring Tesla, is not
enough to affect Balan's total recovery vis-à-vis the § 998 offer. She still "beats" it.

more favorable award" from Tesla's point of view in this arbitration.  While Balan is in fact not entitled to recover the entirety of her pre-June 9, 2017 attorneys' fees and costs for the reasons set forth later in this Award, Tesla's offer included "all costs of suit and attorneys' fees *potentially* recoverable in this action" (emphasis added).  Thus, all of Balan's pre-offer "potentially recoverable" costs and fees (which by definition includes 100% of her claimed fees and costs as of June 9, 2017) are relevant in determining whether Balan "beat" Tesla's § 998 offer.  This means that both Balan's successful and unsuccessful claims and her ultimate recovery (or lack thereof) on those claims are relevant to this equation.[66]  Tesla has failed to cite any legal authority to support its contrary position.

Here, Balan "beat" Tesla's § 998 offer.  Under § 998, not only is Balan entitled to recover her pre- and post-offer costs, subject to the limitations set forth below, but Tesla is not entitled to recover its post-offer costs or its post-offer costs for expert witness fees (*see,* Cal.Civ.Proc. § 998(c)(1)).

19.  **Balan's Claim for Attorneys' Fees.**  On August 20, 2018, Balan submitted her application for attorneys' fees.[67]  Using a standard lodestar method, Balan claims that her three primary (and a number of junior) lawyers spent a total of $1,060,571.57 in attorneys' fees on the totality of her case.  Recognizing that she is only entitled to recover for fees spent on her wage and hour claims,[68] but arguing that all of her other claims were so "inextricably intertwined" with the wage and hour matter that it would be impossible to tease the wage and hour work out of the whole in any meaningful way, Balan argues that a 15% across the board reduction should be

---

[66]  Tesla's § 998 offer also stated that it included, "as a component, Claimant's costs and fees heretofore accrued, in exchange for a final dismissal of this entire action by Claimant" (*see,* Decl. of Yosef Peretz, Ex. 14.)  Tesla did not include any limitations on this language.  It did not, for example, state that its offer included only those costs and fees heretofore accrued that a court or arbitrator subsequently finds "reasonable."  The arbitrator shall not read such an otherwise unspoken limitation into this provision (*see, Series AGI W. Linn of Appian Grp. V. Inv'rs DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 164 (courts cannot rewrite contracts to make better deals for parties than they negotiated for themselves)).

[67]  Balan's request for costs is addresses separately (*see,* pp. 59 *et seq., infra*).

[68]  Balan seems to argue that she prevailed on some of her discrimination claims as well (*see,* Balan's August 20, 2018 Letter Brief in Support of her Motion for Attorneys' Fees and Costs ("Sup. Br."), p. 1), but this is in error.  Balan prevailed on her misclassification claims only, not on any other asserted cause of action (*see,* the Arbitrator's specific findings re liability, p. 47, *supra*).

applied to her fee application, thereby taking into account fees spent on those claims for which she was unsuccessful. This yields a fee application of $828,509.88, which Balan submits is the proper measure of the attorneys' fees she spent to fix her improper employment misclassification.[69]

Tesla, of course, disagrees with this approach. It argues, first, that the Arbitrator has already "ruled" that Balan is entitled to a "*small* **fee award**" (Tesla's Amended Opposition to Motion for Attorneys' Fees and Costs, pp. 1, 2) (emphases in original) because she only prevailed on her misclassification claims. The Arbitrator has made no such "ruling;" the Arbitrator stated only that Balan's claim for fees would be limited to the causes on which she prevailed, and not to any other claims litigated during the arbitrations. Second, Tesla argues that Balan's counsel have made a serious mathematical error in calculating the total attorney hours spent on the case as a whole.[70] Finally, Tesla argues that because the Arbitrator only awarded Balan $122,343.25 (not including interest), which represents but a fraction of the $6 million she sought in total damages, the Arbitrator should apply the awarded fraction to the total sought and award Balan the resulting number in fees, which turns out to be $28,975.00. Neither Balan nor Tesla is correct.

a.    **The Applicable Legal Standard for Awarding Attorneys' Fees.**

Provided that a contract allows for the recovery of attorneys' fees and provided that a prevailing party has been determined, California courts primarily use the lodestar method to best determine the appropriate attorneys' fees award (*Ketchum v. Moses* (2001) 24 Cal. 4th 1122, 1135; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095-96). Lodestar is computed by multiplying the number of hours reasonably expended by each professional by that professional's current reasonable hourly rate (*PLCM Group, supra*, 22 Cal.4th at 1095).

---

[69]     Balan states that she is doing this because she "understands the Arbitrator's desire to reduce the fee award…" (Sup. Br., p. 2). The Arbitrator does not understand this statement. The Arbitrator told Balan that she could only recover fees for the wage and hour component of her case and not for claims that she lost on the merits, which was everything else. For the wage and hour portion, however, Balan is entitled to the full measure of reasonable legal fees she spent to enforce her rights, regardless of what that amount might be.

[70]     The parties have since stipulated to the correct number of hours worked, which is 1,576.5 hours, not the 3,001.4 hours Balan's counsel originally claimed.

The ultimate goal of the court when making an attorneys' fees award is to ensure that the award is reasonable (*In re Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 557). The party seeking the award has the burden of proof. That party must show that the fees incurred were "allowable," that they were "reasonably necessary to the conduct of the litigation," and that they were "reasonable in amount" (*Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 816).

An arbitrator or district court may also consider the "results obtained" when determining whether to adjust a prevailing party's fee upward or downward (*see, Hensley v. Eckerhart* (1983) 461 U.S. 424, 434-37). "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief" (*Id.* at 434). In such instances, "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith" (*Id.* at 436). Thus, the most critical factor is the degree of success obtained.

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified (*Id.* at 436-37; *see also Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 417-18).

### b. Balan's Hours Spent on Misclassification are not "Inextricably Intertwined" with the Hours Spent on her Other Claims.

The biggest issue with Balan's fees request is her argument that the fees spent on her misclassification claims are so "inextricably intertwined" with her fees spent on her other claims that it is impossible to separate them out. As noted above, Balan's response to this conundrum is to suggest that a flat 15% be deducted from her total fee award, asserting *sub silentio* that 85% of her fees were spent to rectify her misclassification claim, while only 15% of her fees were spent litigating her (1) two factually distinct wrongful termination claims, the first for the joint reasons

that she had complained about misclassification and because she may have cancer, and the second in retaliation for her alleged whistleblowing activities, as well as discrimination based generally on her sex; (2) her claim of retaliation in violation of FEHA; (3) her claim of sex discrimination in violation of FEHA; (4) her claim that Tesla failed to prevent discrimination and retaliation in violation of FEHA; (5) her assertions of Tesla's unfair competition activity; (6) her claim that Tesla failed to investigate her whistleblowing reports of financial misconduct and other fraudulent activities (Labor Code §1102.5)[71]; (7) her claim for emotional distress damages; medical issues, and punitive damages claims.  This argument falls of its own weight.

First, Balan's closing brief, which is 49 pages long, devotes twelve pages to her legal and factual analysis of why she was misclassified.  She devotes ten additional pages attempting to justify her claim to over 4,200 hours of overtime, a claim that the Arbitrator found was materially and demonstrably flawed (*see,* discussion of Schedules B and C, pp. 15 – 26, *supra*). This doesn't involve simple overstatement or slight exaggeration; these Schedules, and the citations to the record in support of them, are affirmatively misleading.  The Arbitrator doesn't accuse Balan's counsel of intentional misconduct (it was Balan's exaggerated testimony they were dealing with, after all), but it would have taken very little additional effort – which the Arbitrator took (*see, Ibid.*) – to determine that vast quantities of Balan's testimony regarding her overtime hours (including meal and rest periods) were inflated, unreliable and contradicted by the evidence, most frequently her own testimony.  Yet Schedules B and C were presented to the Arbitrator as Balan's "detailed hours analysis" of her overtime work (Balan's Closing Brief, p. 13).

Balan asserts that the testimony of no fewer than twenty-one of her witnesses contains information that touches upon her working conditions, and the Arbitrator's consideration of that testimony was necessary for him to reach his conclusion that she had been misclassified.  This is simply wrong.  It may well be true that the testimony of many witnesses touched upon her work as a CATIA operator, but that's not the issue.  The question is whether that testimony was

---

[71]     This is different from and in addition to her claim that she was retaliated against and terminated from her second period of employment at Tesla.

reasonably necessary for Balan to prove that she had been misclassified, not whether it tangentially referred to her working conditions. In the Arbitrator's view, the vast majority of that testimony was not. The only relevant testimony was that which was necessary to delineate the type of work she did during her two periods of employment. That testimony, including relevant cross-examination, could surely have been concluded in two hearing days, or less. The fact that the testimony of "classification-relevant" witnesses inevitably expanded into her many other claims for redress, all of which were unsuccessful, does not vault the additional time involved into compensable hours for purposes of a fees motion on the misclassification issue.

The Arbitrator offers several instances of the foregoing. Balan argues, for example, that she needed the testimony of expert witnesses to prove her misclassification (*see,* Balan's Reply Brief, p. 2). But no expert witnesses were called to provide opinions on that topic. So, too, with Balan's argument that that she was unlawfully terminated from her first period of employment because she complained about being misclassified (*Ibid.*). While the word "misclassification" is relevant to both her actual misclassification and to her claim that she was terminated because she complained about it, the two are logically and legally separate. While there would inevitably be some overlap in testimony in two hypothetical hearings, one focused on whether she was misclassified and the other on whether she was terminated because she complained about it, the two could clearly proceed on separate – and severable – tracks. The premise of neither needed to be established to prove the other. At this juncture of her argument, however, Balan makes several important points regarding discovery issues that decidedly (but not exclusively) run in her favor. The Arbitrator addresses those arguments.

### i. **Attorneys' Time Spent on Discovery Battles.**

A bizarre and as yet not satisfactorily explained discovery glitch cropped up several times during discovery, namely, the existence of Balan's emails. When Balan was re-hired by Tesla in June 2013, Tesla was unable to produce numerous emails of hers dated between January 1-18, 2013. Tesla's excuse was that some sort of company-wide technical glitch had occurred that destroyed the backup for the entire plant's emails during this period. Tesla produced Geoffrey Petry to explain this situation, first by declaration during discovery and then in person during the

hearing.  Tesla's position was made more difficult by the fact that, barely a few weeks before the hearing, Tesla unexplainedly produced several dozens of Balan's emails that had been written during the "corruption" period.  Balan's counsel had to expend several dozen otherwise unnecessary hours to obtain both discovery about these "lost" emails, including a motion to compel and wasted hearing testimony trying to understand from Mr. Petry what had happened to them.[72]  These emails were potentially relevant both to Balan's misclassification claim itself, as well as to the related but equally important issue of how many uncompensated hours Balan had worked as a misclassified employee.  Balan's counsel will be compensated for their work in trying to get Tesla to disgorge these relevant emails.

Another discovery issue cited by Balan's counsel, but with which the Arbitrator does not agree, involves an email sent by Balan to Tesla's CEO, Elon Musk, who then forwarded it to another Tesla employee.  Tesla had redacted the name of the "forwarded" recipient, as well as Musk's comments that went with the forwarded email.  Balan spent a great deal of time trying to get the forwarded email, a dispute which was resolved when the email was given to the Arbitrator for *in camera* review.  The Arbitrator determined that it was not relevant and did not order its production.

During the Hearing, however, in reaction to Balan's ricocheting testimony about unlawful activity,[73] the Arbitrator decided *sua sponte* that the better course was to order production of the entire email string.  Balan now claims that all of the time her counsel spent trying to get the forwarded email should be compensated because "the Arbitrator determined that the forwarded email was relevant after all" (Balan's Reply brief, p. 11).  This is inaccurate.  The Arbitrator ordered its production only because Balan's frequently disjointed testimony and shotgun accusations suggested to the Arbitrator that there might be some hidden relevancy in the email that did not appear on its face, and that the better course was to order its production.  The legal efficacy of the Arbitrator's initial determination of non-relevance is underscored by the fact that Balan never discussed the forwarded email or offered it into evidence during the Hearing.

---

[72]     At the Hearing, Petry could only testify that "I honestly don't know where these come from.  I honestly don't know."

[73]     All of this initial testimony was discredited as the Hearing progressed.

Moreover, the email, as written or as forwarded, was not probative of Balan's misclassification claims; time spent trying to have it produced will not be compensable.

The Arbitrator also adverts to the substantial time spent by the parties on discovery following Balan's belated expansion of her emotional distress and medical claims to include PTSD and Broken Heart Syndrome. This was a costly endeavor, and one that did not end well for Balan. At the Hearing, even her own experts were equivocal about whether Balan suffered from either of these maladies. Moreover, neither relates to the misclassification issue.

Tesla next argues that Balan' attorneys are seeking to be compensated at unreasonably exaggerated rates. Although the Arbitrator determines that he need not address this issue because his award of reasonable attorneys' fees will not be based on an "hourly rate times number of hours" basis, but rather on the basis of a flat reduction of requested fees, he addresses Tesla's argument regarding the reasonableness of Balan's counsels' fees.

### c.   Balan's Attorneys' Hourly Rates are Reasonable.

"The hourly rates to be used in computing the lodestar must be 'within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work'" (*Children's Hosp. & Med. Ctr. v. Bonta* (2002) 97 Cal.App.4th 740, 783). The fee applicant bears the burden of producing evidence that the requested rates are reasonable and in line with those prevailing in the community for similar work (*See Computer Xpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1020). Balan has met her burden.

Balan is seeking recovery of her attorneys' fees based on hourly rates of $650 (Peretz and Cravens), $550 (Lebowitz), $425 (Garibaldi), and $450 (Haswell). In support of these rates, Balan cites a variety of cases in which courts recently approved similar hourly rates for attorneys at Peretz & Associates, as well as the testimony of other Bay Area employment litigation practitioners and objective metrics like the Laffey Matrix. The sole reason that Tesla objects to these rates is that in July 2017, Balan's attorneys filed a motion for sanctions in a discovery dispute in which they sought attorneys' fees sanctions for the taking of a deposition, citing an hourly rate of $450 for Peretz and $250 for Garibaldi. According to Tesla, Balan has cited no plausible explanation for Balan's attorneys' sudden increase in their fees.

Tesla has provided no support for its position that this one-line statement in Balan's discovery motion brief was an affirmative representation of Balan's counsel's hourly rates in 2017, however. Indeed, this one line came from a portion of Balan's brief; it was not part of any affirmative signed declaration. This statement, therefore, cannot be assigned the meaning or significance that Tesla herein proposes. Moreover, Tesla has failed to present any declarations from other Bay Area practitioners to support its claim that Balan's counsel's rates are unreasonable. Without any factual or legal support for its objections, Tesla's objections are rejected. Moreover, without going into excessive detail, Balan has more than met her burden of proving that her counsels' hourly rates are reasonable (*see,* Decl. of Yosef Peretz, 8/20/18, and exhibits attached thereto).

### 20. **Balan is Entitled to Recover Reasonable Attorneys' Fees in the Sum of $125,000.**

The Arbitrator has carefully reviewed counsels' time records to determine whether it would be possible to calculate time spent only on Balan's misclassification claims from them. Unfortunately, they are hopelessly generic, and provide no principled basis for an award of fees on an "as worked" basis. Therefore, considering the totality of the pre-hearing work done on the misclassification claims, including the unnecessary discovery work related to Tesla's failure to produce Balan's emails, and also to the Arbitrator's conclusion that the misclassification case could easily have been tried in two days, plus taking into account the size of Balan's recovery when compared to the amount she initially sought, the Arbitrator finds that a reduction of the requested fees to the total sum of $125,000 is warranted. This figure has been reached as a result of the Arbitrator's discretion, exercised only after considering all of the relevant considerations that apply to an award of attorneys' fees.

### 21. **Balan is Entitled to Recover her Reasonable Costs to the Extent that they were Incurred to prove her Misclassification Claim.**

Balan asserts that she has incurred $85,854.07 in reasonably necessary costs in connection this arbitration. Tesla takes the position that, after deducting the costs for her medical experts (a position with which the Arbitrator agrees), Balan should only recover costs in the same relationship as her recovery bears to her overall damages demand. Tesla pencils out

that number at $3,000.  As with the parties' position regarding recoverable legal fees, the Arbitrator disagrees with both.

The Arbitrator does agree with Tesla that the $26,104.14 Balan spent on medical experts in connection with her failed claims of PTSD and Broken Heart Syndrome should be disallowed totally.  These include costs charged by Drs. Weil, Siecke, Greene,[74] Aboosaidi, Sommerville, Sherman, and Newman.  So, too, with her costs incurred to establish the value of her lapsed stock options; Balan voluntarily quit Tesla twice, her stock options lapsed, so the valuation testimony of Mr. Buyniski became irrelevant and is not recoverable.  The Arbitrator will also disallow many of her claimed deposition costs, as these relate to depositions of witnesses whose purpose was not to prove misclassification, even though their testimony touched upon her work, but not in the misclassification sense.  These include, in whole or in part, the depositions of Balan herself, Geiduschek, Barker, Tenneson, Allen, Raczkowski, Bach, Garcia, Porritt, Gawronski, Peretz, Romano, and Edwards.  (The Arbitrator was unable to find deposition costs for Villanueva and Nussey, although he assumes that such depositions were taken.  They would fall into the category of "partially allowed," and will be estimated based on comparison with other "partially allowed" deposition costs.)  The deposition costs for Ruiz, Parkhurst, Heley, Goldman, Austin, Dinev, Bolosan, Fabri and Lyons are disallowed.  (The Arbitrator was unable to find deposition costs for Gruss and Sadoo, although he assumes that such depositions were taken.  They would fall into the category of "disallowed.")  The costs for Petry are allowed in their entirety.  Considering all claimed costs and applying the applicable standard of "reasonable costs needed to establish the misclassification claims for both periods of employment," the Arbitrator awards costs of $30,000.

## 22. <u>Claimant is Entitled to Interest on her Overtime and Double-Time Wages</u>.

The parties agree that Claimant should we awarded interest on her overtime and double-time damages but disagree how that interest should be calculated.  Claimant argues that interest should commence from the first day of her employment for each period, while Tesla argues for

---

[74]     The Arbitrator recognizes that the testimony of Drs. Weil, Siecke and Greene touched, in part, on whether the hours that Balan claimed to have worked had any effect on her claims of emotional distress.  The Arbitrator did not award any emotional distress damages, however, so the testimony of these medical experts does not fall within the category of recoverable costs.

application of interest from the last day.  The Arbitrator agrees with neither position.  As it is virtually impossible to determine the days on which Balan worked overtime or double-time during either period of employment, and since the fault for that inability falls on both Tesla (who failed to keep the required records of hours worked) and Balan (who materially exaggerated and overstated both her overtime and double-time hours), the Arbitrator adopts a compromise position.  Interest will be calculated (separately) on the total wages awarded for each period of employment in the following manner.  Using the first period of employment as an example (August 2, 2010 to January 18, 2013), counsel will count the total days covered by this employment (here, that number is 767 days).  That sum will be divided in half (here, 383 days) and that number of days will be added to Balan's first day of work to determine the mid-point of her employment (for her first period, that day is January 16, 2012).  Counsel will then take the total wage/meal damages awarded for that period of employment and calculate interest on that sum from the middle of the employment period to the date of payment.  The same calculation will be then be undertaken for the second period of employment.  Interest in this manner will be calculated at the pre-judgment rate of 7%.

Following service of this Award, all sums awarded herein will accrue interest at the post-judgment interest rate of 10%.  The Arbitrator disagrees with Tesla's argument that the 90-day tolling period the parties entered into from January 1, 2015 to April 1, 2015 should operate to deprive Claimant from her legal entitlement to interest during that time.

23.  **Conclusion.**  Balan is entitled to an award of past wages in the total amount of $122,343.25, plus interest at the pre-judgment rate of 7% to be calculated as set forth in Section 22 of this Final Award.  Balan is not awarded damages on any other theory of liability asserted in this arbitration.  Balan is also awarded her reasonable attorneys' fees needed to establish her employment misclassification claim in the sum of $125,000, plus the reasonable costs incurred to establish her misclassification claim in the additional sum of $30,000.  This fees and costs award of $155,000, as well as the "total wages plus interest" sum calculated under Section 22, will begin to accrue interest at the post-judgment rate of 10% from service of this Final Award until payment.

This Final Award resolves, on the merits, every question of law and fact presented to the Arbitrator for resolution.  Any issue or question of law or fact not otherwise expressly addressed in this Final Award has been decided adversely to the party with the burden of proof with respect to it.

IT IS SO ORDERED:

October 17, 2018

_____
Judge James L. Warren (Ret.)
Arbitrator

FINAL AWARD-CORRECTED

## <u>PROOF OF SERVICE BY EMAIL & U.S. MAIL</u>

Re: Balan, Cristina vs. Tesla Motors, Inc.
Reference No. 1100080567

    I, Tina Oja, not a party to the within action, hereby declare that on  October 18, 2018, I served the

attached Final Award-Corrected on the parties in the within action by Email and by depositing true copies

thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San

Francisco, CALIFORNIA, addressed as follows:

Alexander Hernaez Esq.
Lucy Li Esq.
Fox Rothschild LLP
345 California St.
Ste 2200
San Francisco, CA  94104
Phone: 415-364-5540
ahernaez@foxrothschild.com
lli@foxrothschild.com
   Parties Represented:
   Tesla Motors, Inc.

Yosef Peretz Esq.
David Garibaldi Esq.
Peretz & Associates
22 Battery St.
Suite 202
San Francisco, CA  94111
Phone: 415-732-3777
yperetz@peretzlaw.com
dgaribaldi@peretzlaw.com
   Parties Represented:
   Cristina Balan

    I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco,

CALIFORNIA on  October 18, 2018.

Tina Oja
toja@jamsadr.com

Follow us on **LinkedIn** and **Twitter**.